# Warnock, Appellant, *v.* Philadelphia Trust Company.

*Brokers—Real estate brokers — Commissions — Sale to government or government agency—Illegality of contract.*

A real estate broker who sells real estate to the government or to a government agency, such as the Fairmount Park Commission of the City of Philadelphia is entitled to his commissions, if the sale has been effected in perfect good faith by the owner, the broker, and the government agent or agency.

Where the Fairmount Park Commission of Philadelphia enters into an agreement with a real estate broker to purchase the land of the broker's principal, the fact that the commission had the board of viewers approve the negotiation in describing the acreage and the amount of damages, and had this report confirmed by the court, does not affect the owner's liability to pay commissions to his broker; and especially is this the case where the owner, the guardian of an insane person, secured the approval of the court to the price to be received, subject to a designated broker's commission, and actually received the purchase-money.

Argued Oct. 25, 1917. Appeal, No. 64, Oct. T., 1917, by plaintiff, from judgment of Municipal Court, Phila-

delphia Co., June T., 1916, No. 191, for defendant n. o. v., in case of A. DeGrauw Warnock and George W. Emlen, Jr., Copartners, trading as Warnock & Emlen, v. Philadelphia Trust Company, Guardian of the Estate of John J. Thompson, an insane person. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, KEPHART, TREXLER and WILLIAMS, JJ. Reversed.

Assumpsit to recover commissions on the sale of real estate. Before BONNIWELL, J.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was in granting defendant's motion for judgment n. o. v.

*F. L. Clark,* of *Peck, Shields & Clark,* for appellant.— Neither the contract of employment nor the execution of the contract by the plaintiffs was against public policy: Oscanyan v. Arms Co., 103 U. S. 261, 275-276; Kansas City Paper House v. Foley Ry. Printing Co., 85 Kan. 678; Peters v. Holmes, 45 Pa. Superior Ct. 278.

The method of conveying the land to the purchaser cannot defeat the plaintiffs' right to a commission: Keys v. Johnson, 68 Pa. 42.

*Isaac Pennypacker* of *Henry, Pepper, Bodine & Pepper,* for appellees.—A contract to procure for compensation a legislative act is void as against public policy irrespective of the methods employed or the character of the compensation: Clippinger v. Hepbaugh, 5 W. & S. 315; Bowman v. Coffroth, 59 Pa. 19; Spalding v. Ewing, 149 Pa. 375; Ormerod v. Dearman, 100 Pa. 561; Woodstock Iron Co. v. R. & D. Extension Co., 129 U. S. 643; Tool Co. v. Norris, 2 Wallace 45; Oscanyan v. Winchester Arms Co., 103 U. S. 643; Swift v. Aspell, 82 N. Y. Supp. 659; Hazleton v. Sheckels, 202 U. S. 71.

OPINION BY ORLADY, P. J., July 10, 1918:

In 1914 John J. Thompson was the owner of seventeen twenty-fourths, and controlled the remaining seven twenty-fourths of a property adjoining Fairmount Park, Philadelphia, which he desired to sell. To effect that he employed the plaintiffs to procure a purchaser of a part or all of his said real estate, which was known as "Sugar Loaf," and contained about twenty-three acres. The plaintiffs were duly licensed real estate brokers, and pursuant to the authority so given they had the tract surveyed, for which they paid $200 to the city, and subsequently the defendant repaid to them $88.88, as representing the proportionate cost of the survey of the land involved in this controversy. A number of persons were interviewed and special efforts were made to secure a purchaser.

In the fall of 1914 negotiations were started to sell a part of the tract to the Fairmount Park Commission as an addition to Fairmount Park, and these were so proceeded with that in March, 1916, the title to 9,846 acres of the property was passed to the commission at the price of $29,538.

The claim of the plaintiffs in this case is two per cent. as a broker's commission on the sum named, or $590.76, payment of which was refused by the defendant, and this suit was brought to recover in the Municipal Court. On the trial a verdict was returned in favor of the plaintiff, which, on motion for judgment non obstante veredicto, was set aside and a judgment entered in favor of the defendant.

In April, 1915, John J. Thompson was adjudged a lunatic, and by a decision of the Court of Common Pleas of Philadelphia, the Philadelphia Trust Company was appointed the guardian of his estate, and the negotiations theretofore started by the plaintiffs were continued, and ratified by the defendant through a number of personal interviews and correspondence and resulted in

the Fairmount Park Commission, which had been procured by the plaintiffs, becoming the purchaser as above stated. The sole defense to the plaintiffs' claim as urged by the defendant is, that they are not entitled to recover as brokers, for the reason that their relation to the transaction in negotiating with the Fairmount Park Commission was contrary to public policy, and they should not receive compensation for such services, however meritorious and free from impropriety they were.

Three authorities are relied on to sustain this proposition, Clippinger v. Hepbaugh, 5 W. & S. 315; Bowman v. Coffroth, 59 Pa. 19; Spalding v. Ewing, 149 Pa. 375. These with other cases of similar import are quoted by the court in the opinion entering judgment in defendant's favor.

In an analysis of the cases cited, we feel there is a wide distinction in their facts and those involved in the present inquiry. In Clippinger v. Hepbaugh, the basis of the claim was that the defendants should succeed in having the legislature pass a law authorizing the sale of certain real estate. In Bowman v. Coffroth, a member of Congress claimed $500 to secure immunity for his client from the draft during the civil war, through official influence. In Spalding v. Ewing, the defendant promised to pay for services rendered in securing the passage of an act of Congress to require the postmaster general to make payment of a claim, which had been resisted for years as invalid and unlawful. These contracts were declared void as being contrary to public policy and of a type which are held invalid in all jurisdictions.

Contracts to pay a commission for influencing legislative action, or compensation contingent on securing such a result upon a percentage for pecuniary benefit resulting from such legislation, or to sell property of any kind through the personal influences of brokers which induces legislation for a consideration, are al-

ways held to be illegal and void. It is a hard and fast rule that should not be departed from, where there is any suggestion of personal influence or venal advantage, or the use of extraneous secret agencies upon governmental powers to induce such result by the government, the promoters or agents should not profit thereby, for the reason, as stated by Mr. Justice FIELD, in Tool Company v. Norris, 2 Wallace 45, "Whatever tends to divert the attention of the legislators in their high duties, to mislead their judgments, or to substitute other motives for their conduct than the advancement of public interests, must necessarily and directly tend to impair the integrity of our political institution." The law guards with jealousy every avenue to the courts of justice and strikes down every thing in the shape of a contract which may afford a temptation to interfere with its due administration: Ormerod v. Dearman, 100 Pa. 561.

But it is just as clearly decided that there is a distinction between agreements to procure legislation, and agreements to make a sale to a government. A person having something to sell has a right to sell it through an agent, and this right is an incident to his ownership. To declare that he may not employ an agent upon commission when the government is the prospective buyer is to take away what is ordinarily one of the elements of ownership,—the unrestricted right to sell. All agreements whose object or tendency is in any way to interfere with or unduly influence legislative action, either by Congress or by a state legislation or by municipal council or other like body, are contrary to public policy and void: 9 Cyc. 486, where authorities from many of our sister states are collated.

In this case, the contract was to find a purchaser, any purchaser, and not any particular purchaser. When the Fairmount Park Commission became interested in the proposition the parties dealt in the open and ad-

versely.   The purchase of the land by the commission had no relation to the brokers' commission.   The contract was legal in its inception, and the plaintiffs performed their part of it by procuring a purchaser who accepted title, paid the purchase-money, and the sale was consummated by the principals without the intervention of the brokers: Keys v. Johnson, 68 Pa. 42; Peters v. Holmes, 45 Pa. Superior Ct. 278.   Commission agreements for sales to governments have been upheld and enforced where the agreements did not suggest corruption in its performance, and where unfairness in the dealing or an intention to apply an improper method did not appear from the facts: Swift v. Aspell, 82 N. Y. Supp. 659; Kerr v. American Pneumatic Service Co., 188 Mass. 27; Oscanyan v. Arms Co., 103 U. S. 26.

The Fairmount Park Commission was constituted by an act of March 26, 1867, by which act and a number of supplements, the commission is authorized to acquire title to land through negotiation and agreement with owners, to purchase land, to lay out and ornament the park, to erect buildings, to resort to condemnation proceedings and otherwise acquire for the public use land appropriate for park purposes.   The damages for land so taken to be fixed by a jury or board of viewers, and the right and power of the commission to acquire title either by purchase or through condemnation proceedings is not challenged.

In this case, after the parties had agreed upon all details as to acreage and price, it was agreed that the property should be taken over by the park commission at the rate of $3,000 per acre, and the agreement was submitted to a board of viewers, appointed by the Court of Common Pleas No. 2, on August 9, 1915, to assess damages caused by the appropriation for public park purposes of certain tracts of land (including the Thompson property) adjoining and now used for park purposes, and was finally confirmed upon the terms mentioned.   This was

followed by the defendant executing and delivering a deed to the City of Philadelphia, for the land described for the uses of the Fairmount Park Commission.

It further appears by the record, that notice was given to the park commission and to the court in the petition for leave to sell the land, and execute a deed therefore, that the purchase-price to be paid to the trust company was to be "subject to commissions of two per cent. to real estate brokers who are affecting the sale." This proceeding followed the custom to relieve any doubt as to title, but did not change the relation of the plaintiffs to the transaction. Further, when the plaintiffs procured the park commission as a purchaser, special counsel acting for the trust company took up the final negotiations with the commission and remained actively identified with the matter until its final adjustment,— that is, the owner of the property took out of the hands of the brokers the final arrangement as to the amount of purchase-money to be paid, the terms of payment and the method of conveying the title. Neither the reason nor the necessity for the ruling suggested in the cases condemning brokers' contracts apply to the facts in this case, and the trust company, after securing the approval of the court to the price to be received, subject to the brokers' commission of two per cent., and having the money in its hands, cannot now claim that the services were improperly performed or that the compensation agreed upon should be withheld.

The park commission could receive as perfect a title to the land by deed, and the fact that they had the board of viewers approve the negotiation in describing the acreage and the amount of damages, and have this report confirmed by the court, did not affect the defendant's liability to pay the commission due to its selected brokers. There is nothing to indicate that any other than proper and professional influences were applied, and it affirmatively appears that all parties interested, the owner, the

brokers and the commission acted in perfect good faith. In such an open-handed transaction there is no taint of improper influence affecting the exercise of sovereign power or public rights. We find no case in which an agreement to pay for service in selling goods to a public body, which was found to be otherwise fair and unobjectionable, has been held void because payment was to be made only in the event of a sale being effected: Kansas City Paper House v. Foley Ry. Printing Co., 85 Kansas, 678 (s. c.) 39 L. R. A., N. S. 747.

For the reasons given above the judgment entered for the defendant non obstante veredicto is reversed, the record is remitted to the court below with direction that judgment be entered on the verdict.