## Abrahams v. Epstein et al.

*John E. Flynn,* of *High, Swartz, Flynn & Roberts,* for plaintiff.

*Morris Gerber,* of *Wisler, Pearlstine, Talone & Gerber,* and *E. Arnold Forrest,* for defendants.

DANNEHOWER, J., August 18, 1949. — This is an action in assumpsit brought by plaintiff, a lawyer and honorary consul of the Dominican Republic, against 13 individuals, individually and trading as the Acme Coppersmithing and Machine Co., a partnership, to recover on a quantum meruit the fair and reasonable value of personal services to secure for defendants the right to erect an alcohol plant and distillery in the Dominican Republic, according to an alleged oral contract made with Samuel G. Fisher, a partner of the defendant firm.

The affidavit of defense denied ever having engaged the services of plaintiff in any capacity, and also alleges, inter alia, "that Samuel G. Fisher assured plaintiff that if, as a result of plaintiff's assistance, the sale of a distillery to the Dominican Government was consummated, he would be compensated notwithstanding plaintiff's official capacity with the Dominican Government," also, "any compensation would have been conditional on a consummation of a sale and hence plaintiff's services were worth nothing." The affidavit of defense did not allege the illegality of the alleged oral contract for the reason that plaintiff was an honorary consul of the Dominican Republic, and therefore contrary to public policy.

At the conclusion of the trial, the jury rendered a verdict in favor of plaintiff in the sum of $19,500. Defendants have filed a motion for judgment n. o. v. and for a new trial, alleging 30 reasons therefor. After argument before the court en banc, these motions are pending for decision.

Reviewing the evidence in a light most favorable to plaintiff, and giving him the benefit of every reasonable inference to be deduced therefrom, the jury could have reasonably found from the evidence that plaintiff was a lawyer of 20 years' experience, a trustee of Dickinson Law School, a former assistant city solicitor for Philadelphia, a writer for legal periodicals and magazines, one who had represented a large number of foreign governments, as well as individuals with claims against foreign governments, and served for 16 years and still is honorary consul of the Dominican Republic at Philadelphia.

On August 28, 1945, he was invited to the office of defendant partnership, located at Oreland, Montgomery County, Pennsylvania, and there met one of the partners, Samuel G. Fisher. At this meeting there were also present a lawyer, Morton Mitosky, and Samuel Weisenfield. Mr. Fisher informed plaintiff that in 1941 defendant firm, through an agent, had entered into negotiations with the Dominican Government for the purpose of erecting a plant for the manufacture of alcohol from grain and for blending the alcohol with gasoline for automotive purposes; that negotiations had bogged down because of the war; that he had offered the agent $100,000 if the plant could be sold to the Dominican Government; that now his partnership had accumulated large capital sums, with which he desired to build such a plant and operate it on their own partnership capital rather than make an outright sale of the plant, and he desired to revive negotiations with the Dominican Republic. He requested plaintiff to represent defendants, notwithstanding his official capacity, and requested that he present three plans to the Dominican Government for approval. In the first plan, defendants would erect the plant, the profits therefrom would be divided into two

parts, 50 percent of which would go to defendants as profits, and 50 percent would go to defendants to amortize the cost of building the plant. He estimated the cost of erecting the plant would be between $600,-000 and $650,000, and that it would take about 10 years to pay back the principal outlay, when the plant would become the property of the Dominican Republic. Mr. Fisher said that this plan was the most preferable and profitable to his firm, and desired plaintiff to have it accepted by the Dominican Government. The second plan was to have the Dominican Government pay one half the cost of construction. Defendant partnership and the Dominican Government would then operate the plant as partners until defendants' principal had been repaid. The third plan was an outright sale of the plant to the Dominican Government. Mr. Fisher then got out the file of previous correspondence, together with the plans and 27 pages of specifications which had been originally submitted in 1941. These were then photostated and a copy delivered to plaintiff for study, so that he could familiarize himself with the history and details. They were admitted at the trial.

Plaintiff agreed to represent defendants and immediately went to the Dominican Republic by plane. He first saw the Secretary of State, and explained his connection with defendant firm, which the secretary noted on his official record. This disclosure of his agency and notation on the record gave plaintiff authority to represent defendants, notwithstanding his official capacity as honorary consul. He then saw Mr. Frank Parra, a member of the Dominican cabinet charged with domestic and foreign commerce of every kind. He was the same person with whom defendants had negotiated in 1941 in attempting to sell a plant to the Dominican Government, and had been written to by defendants under date of March 7, 1941, submitting

their former proposals. Plaintiff submitted to Mr. Parra, the first or preferred plan which was finally acceptable to Mr. Parra and his government. Plaintiff then telephoned to Mr. Fisher from the Dominican Republic, and told him of his success and was warmly congratulated by him. He inquired of Mr. Fisher how long it would take to erect the plant and was told six months. Mr. Fisher promised to send down the formal specifications and instructed plaintiff to return to Philadelphia. Upon plaintiff's return, he attempted to contact Mr. Fisher, but he was away. He cabled Mr. Parra and also wrote him a letter. Eventually he saw Mr. Fisher, together with another partner, Joshua Epstein. Samuel Weisenfield was also present. He informed them that the Dominican Government had accepted their first plan without reservation. Mr. Fisher was delighted and again remarked that the plant would cost between $600,000 and $650,000, when Mr. Epstein, a partner, said it would now cost a million dollars. Mr. Fisher promised to have the engineering staff prepare a formal proposal in a week. Concerning plaintiff's compensation, Mr. Fisher said, "We never yet wanted anybody to work for nothing, and we will not want you to have put your effort in for us for nothing." "I will tell you what we will do, when Mr. Epstein and I get up this formal final specification, when we send it to you, we will write you a letter telling you what our idea is of how much you have earned and if you don't agree with us, come out and talk it over and you will find us easy to deal with." Plaintiff heard nothing for 10 days and telephoned Mr. Fisher, who said they were working on the specifications. Thereafter he called Mr. Fisher several times without getting any satisfactory answer, and finally, on January 15, 1946, wrote Mr. Fisher stating he had gotten exactly what defendants wanted; that the formal

specifications were not forthcoming, and if defendants wanted to withdraw their offer he would inform the Dominican Government and send his bill for services. This letter was unanswered. Plaintiff received a letter from Mr. Parra, stating he had not heard from plaintiff since October 10th, and that he wanted to hear from him. Plaintiff sent a copy of that letter to Mr. Fisher, requesting instructions. Mr. Fisher failed to reply. On February 1st plaintiff sent his bill for $25,000, and on February 6th received Mr. Fisher's letter stating "At no time did we ever enter into any arrangement whatsoever with you to engage your services in a professional capacity."

Plaintiff testified his services were worth $25,000, and his expert witness, Carlos Berguido, testified a reasonable fee would be $50,000 to $75,000. Defendants offered no testimony whatever as to the value of the services. Mr. Samuel Weisenfield corroborated plaintiff as to the terms of the oral contract at the August meeting and also as to what was said by defendant partners upon plaintiff's return. Mr. Morton Mitosky, a Philadelphia lawyer, also corroborated plaintiff as to the August meeting when the alleged oral contract was made, and testified that Mr. Fisher then said "You get this deal through and we will take care of you handsomely." This witness was also present in the Dominican Republic and overheard plaintiff's telephone conversation with Mr. Fisher, telling him that the Dominican Government had accepted the first plan.

Mr. Fisher was defendants' only witness. He testified at first that he had not engaged the plaintiff's services in any capacity and then later admitted that he had engaged plaintiff's services, but he was not to be compensated unless "he was successful in securing a contract or an order" or "unless a sale went through."

Under this conflicting evidence the issues were: was an oral contract entered into, and what were the exact

terms thereof? Plaintiff and his two corroborating witnesses testified that an oral contract to employ plaintiff was made, and Samuel G. Fisher alone, on behalf of defendants, only partially denied it. The jury, after a clear and comprehensive charge, found for plaintiff. We have carefully reviewed all of defendants' reasons for a new trial and not one of them has any merit. Defendants received a fair trial, free of prejudicial error, and there was no intimation throughout the trial, that the alleged oral contract was illegal or unenforcible. The motion for a new trial must be refused.

But defendants' motion for judgment n. o. v. is not free from difficulty. Defendants strenuously contend that a contract to pay the honorary consul of the Dominican Republic in Philadelphia a handsome fee for securing from the Dominican Republic the right to erect and operate an alcohol distillery in the Dominican Republic is unenforcible and void as being contrary to the public policy of the State and Nation, and international law, and its illegality is evidenced by the circumstances that payment was contingent on success, the large size of the fee, employment for a single purpose, the speed with which the contract was performed, and plaintiff's failure to advise the government officials of his contingent interest in the contract.

In the first place, the illegality of the contract was not pleaded, but was first mentioned by defendants in support of their motion for judgment n. o. v. It is true, there is no necessity to plead the illegality of a contract, but this may be taken advantage of at any stage of a proceeding: Waychoff v. Waychoff, 309 Pa. 300 (1932); Chester School District's Audit, 301 Pa. 203 (1930).

Nor can defendants properly contend that such a contract is contrary to diplomatic regulations, consular laws and regulations, international law or Federal law.

At the trial no regulation, foreign law or international law was attempted to be proven, and we cannot take judicial notice of these laws and regulations, if any. This contract was made and is sought to be enforced in the Commonwealth of Pennsylvania, and must of necessity be governed by the laws of this Commonwealth: Kuhn v. Buhl, 251 Pa. 348 (1916). Defendants heavily rely on the case of Oscanyan v. Arms Company, 103 U. S. 261 (1880), where an honorary consul's contract for the sole purpose of selling his personal influence was declared illegal and contrary to public policy. In the present case there is no suggestion or attempt to prove corruption, or personal or improper influence. Plaintiff was a lawyer of 20 years' experience; he represented various foreign governments and had special knowledge of Dominican history, economy and the need of lessening the importation of foreign gasoline and fuel. Nowhere in the record is it even inferred that it was contemplated or intended that any corrupt or improper influence be employed.

"A contract involving the use of personal influence with public executive or administrative officers . . . in order to induce them to grant favors or privileges, is, as a general rule, regarded as against public policy. . . . By some courts all agreements of this character for a compensation paid or promised are held invalid because of their tendency to introduce corrupt means in the influencing of the public official, especially where the compensation is contingent on success, while by others the agreement is not held invalid where corrupt means are not intended to be resorted to, even though compensation is contingent on success": 17 C. J. S. §214.

Public policy permits the utmost freedom of contract between parties, and when voluntarily made such contracts should be enforced unless they are clearly and unmistakably contrary to public right and welfare.

It is not the policy of the law unnecessarily to restrict the right of persons to contract.

In the present case, defendants well knew plaintiff was the honorary consul. They sought his services on a proposition that had bogged down because of the war. There was nothing illegal in the contract. It did not have for its object the violation of the common or statute law, and the test of illegality is that the agreement is to be judged by its character, independent of the intention of the parties. Plaintiff informed the Dominican Government that he was representing defendants, and it is not disputed that it so appeared on the official government records. Since defendants contend that the contract is illegal, "the burden of proving illegality is upon him who alleges it": Hosack v. Taylor Bros., 140 Pa. Superior Ct. 83 (1940). In Warnock v. Phila. Trust Co., 69 Pa. Superior Ct. 589 (1918), it was said, on page 594, "Commission agreements for sales to governments have been upheld and enforced where the agreements did not suggest corruption in its performance, and where unfairness in the dealing or an intention to apply an improper method did not appear from the facts."

A. L. I. Restatement of the Law of Contracts, §562, provides:

"Bargain for Procuring Public Contracts:—A bargain to endeavor to secure a public contract by presenting to the official having power to make the contract inducements except such as relate to the desirability on public grounds of entering into the contract, is illegal; but if no influences other than these are bargained for, or contemplated, the bargain is not illegal."

It would appear that the oral contract in the instant case is valid and enforcible under the rule as laid down by Warnock v. Phila. Trust Co., supra, and also by A. L. I. Restatement of the Law of Contracts, because there was no suggestion of corruption or unfairness in

the dealing, or any intention to use personal or improper influences. It is true, plaintiff was an honorary consul to the Dominican Republic, and we have endeavored to find an exact definition of that term. The Oxford English Dictionary defines under "honorable— holding a title or position conferred as an *honour*, without emolument, or without the usual duties, obligations, privileges etc." It would appear proper for an honorable consul to bargain with his government, where his agency is fully disclosed to all parties and there is no personal or improper influence or corruption intended or contemplated and the bargain itself is desirable on public grounds.

Defendants, who were in the business of erecting, operating and selling plants such as this in 1941, had opened negotiations with the Dominican Republic. These business dealings had practically ended because of the war. Defendants selected plaintiff to revive negotiations and represent them. He made a hurried trip by plane and in four or five days secured the right for defendants to erect, operate and sell a plant on a site outside the capital according to a plan most favored by defendants. Whereupon defendants, realizing that the plant would then cost $1,000,000, and having other pressing business, grew cold and delayed in preparing the specifications. If plaintiff and his two witnesses can be believed, he performed his services and was entitled to some compensation on a quantum meruit. The reasonable value of plaintiff's services stands undenied in the evidence. Defendants have failed to prove that this was a contract for the sale of influence for a special privilege. It was in reality a contract to build, operate and later sell a distillery, and defendants have failed to show that corrupt or improper influences were intended, bargained for and used. Plaintiff's agency was disclosed, the object of the contract was legal, and

his services were of a legitimate character, and nothing sinister or improper was intended, done or contemplated. Therefore, we cannot say that the contract was contrary to public policy and illegal, but on the contrary, the verdict of the jury must be upheld.

And now, August 18, 1949, for the foregoing reasons, defendants' motions for a new trial and for judgment n. o. v. are hereby overruled and refused. Exceptions are granted defendants.