# Spalding *v.* Ewing, Appellant.

149  375
162  304

*Contracts to procure legislation—Public policy.*

Contracts, which have for their subject-matter any interference with the creation of laws or their due enforcement, are against public policy and therefore void: Ormerod v. Dearman, 100 Pa. 561.

While an attorney may claim compensation for purely professional services performed in connection with legislation in which his client has an interest; yet where the client has a claim against the government to enforce which a legislative mandate is required, and his agreement with his attorney is for the payment of a contingent percentage of the amount recovered, and the principal service contemplated and actually performed by the attorney is in the procurement of the necessary legislation, the contract is void as against public policy.

Argued Feb. 8, 1892.   Appeal, No. 288, Jan. T., 1891, by defendant, Washington Ewing, from judgment of C. P. Chester Co., on verdict for plaintiff, Harvey Spalding.   Before PAXSON, C. J., STERRETT, GREEN, McCOLLUM, MITCHELL and HEYDRICK, JJ.

Assumpsit on appeal from judgment of justice of the peace to recover amount claimed for services performed, under written contract signed by defendant.

On the trial before WADDELL, P. J., it appeared by the evidence that defendant had received a post-office department warrant for $94.57, dated Jan. 28, 1889.   The warrant was not received through the plaintiff.   The verdict was for the plaintiff in the sum of $26.06.   The other facts appear by the opinion of the Supreme Court.

Defendant's second point, refused, was as follows: "Your verdict must be for the defendant."

*Error assigned*, among others, was the disaffirmance of defendant's second point, quoting point and answer.

*Charles H. Pennypacker*, for appellant.—The contract was il-

legal and cannot be enforced: Clippinger v. Hepbaugh, 5 W. & S. 315; Hatzfield v. Gulden, 7 W. 152; Bowman v. Cofforth, 59 Pa. 19; Ormerod v. Dearman, 100 Pa. 561.

*William M. Hayes,* for appellee.—Defendant had a claim against the government which he employed plaintiff to collect. The securing of the legislative mandate was but one step in the collection of the claim.

If a man undertakes to influence legislators by ulterior methods to pass acts for the benefit of private parties, such services are against public policy. If attorney undertake by argument to obtain legislative remedies through the action of proper committees of the legislature for the payment of public debts, such services are professional and not against public policy: Wright v. Tebbitts, 91 U. S. 252; Stanton v. Embrey, Adm., 93 U. S. 548–558.

OPINION BY MR. JUSTICE STERRETT, May 23, 1892:

This action, to recover fees alleged to have been earned by plaintiff, is founded on the following contract signed by defendant:

"LANDENBERG, Pa., 1882. I here guarantee that myself, claimant for additional pay as postmaster (at Chandlersville, Landenberg), shall, without delay, upon the receipt of draft for amount which may be collected, remit the amount of fee due his attorney, Henry Spalding, which is understood to be twenty-five per cent. of collection, to the said Henry Spalding, at Washington, D. C."

The character of the services rendered in pursuance of, and doubtless contemplated by this contract, will be best understood by referring to plaintiff's deposition, given in evidence on the trial. After stating that the power of attorney from defendant was procured by a person employed " to obtain powers of attorney in such cases," and that the postmaster general had " for years resisted the payment of defendant's claim, " etc., the plaintiff testifies as follows : " I applied to congress for a legislative mandate to compel the postmaster general to make the necessary readjustments of defendant's salary and the salary of other postmasters, and this application was resisted by the postmaster general. From session to session of congress, I made application to committees having jurisdiction, urging the enact-

ment of the mandate applied for, and, after several years' labor in that behalf I obtained the enactment by congress, on March 3, 1883, of the mandate applied for, which act is known as the Spalding act, by reason of my services in that behalf. Afterwards, the postmaster general tried to avoid complying with this mandate, and I carried on proceedings which compelled him ultimately, in a degree, to comply with the law. . . . I also made arguments on his behalf before the different committees, when, in 1886, the appropriation to pay the first allowance was stricken out of the appropriation bill in the house of representatives, and I saw the necessary report was made to congress of the second allowance, and I took the necessary means to have the appropriations made. The defendant's claim was always resisted by the officers of the post-office department, and, by the most laborious and protracted service on behalf of the defendant, I compelled the payment of the said claims, notwithstanding such resistance."

In his answer to the 5th interrogatory, after again speaking of his long continued service, the plaintiff says: " It was never possible to collect either of these claims without my said service, for the officers of the post-office department, at every stage of the case, down almost to the time of collection, resisted the payment of the claims."

In answering the sixth interrogatory, he further testifies: " That after he had expended time and money for the defendant, and compelled the payment of a claim not otherwise collectible, the defendant has, by a variety of misrepresentations, tried to cheat witness out of his fees."

Plaintiff's son testified, among other things, that his father, " as attorney for Ewing and many others, did secure for them the allowance previously denied, and which, without his aid, they never would or could have secured."

It thus appears by the depositions above referred to that defendant's claim, and many similar claims against the post-office department, had been considered and rejected. As testified by plaintiff, " the postmaster general for years resisted defendant's claim."

The burden of plaintiff's undertaking appears to have been the procurement of what he terms a " legislative mandate," the avowed object of which was to compel recognition of the claims

rejected and so long resisted by the post-office department. It is very evident, from the uncontradicted testimony of plaintiff and his son, that strictly professional service, such as preparing petition to congress, drafting the necessary bill, furnishing such statement and proofs of said claims as were necessary to a prop·er understanding of their merits, etc., must have constituted a very insignificant part of the "several years' labor," "the most laborious and protracted services," the numerous "applications to committees," "from session to session of congress," etc., testified to by him. According to his own account of it, the work of engineering the bill through congress, despite the strong and determined opposition of the post-office department, must have been multiform, persistent, and so conspicuously effective, that plaintiff was honored with the paternity of the "legislative mandate" by calling it the "Spalding Act." The plaintiff's evidence is not susceptible of any other inference than that, in the main, the services contemplated by the contract in suit, and actually rendered in pursuance thereof, were such as have been repeatedly pronounced contrary to public policy. In Clippinger v. Hepbaugh, 5 W. & S. 315, the condition of the obligation to pay $100 was that the obligee should succeed in procuring from the legislature the passage of a law authorizing the obligor and his wife to sell and convey certain real estate devised to the latter and her children. In refusing to sustain the contract, this court said: "It is not necessary to say that a certain compensation for such services may not be recovered; but we are clearly of opinion that it would be against sound policy to sanction a practice which may lead to secret, improper and corrupt tampering with legislative action. It is not required that it tends to corruption; if its effect is to mislead, it is decisive against the claim, and that such is its tendency, no human being can reasonably doubt. . . . The law will not aid in enforcing any contract that is illegal, or the consideration of which is inconsistent with public policy and sound morality, or the integrity of the domestic, civil or political institutions of a State. . . . It matters not that nothing improper was done, or was expected to be done by the plaintiff. It is enough that such is the tendency of the contract, that it is contrary to sound morality and public policy, leading, necessarily, in the hands of designing and corrupt men, to improper

tampering with members, and the use of an extraneous, secret influence, over an important branch of the government. It may not corrupt all; but if it corrupts or tends to corrupt some, or if it deceives or tends to deceive or mislead some, that is sufficient to stamp its character with the seal of reprobation before a judicial tribunal."

The same general principle is recognized in the following cases: Hatzfield v. Gulden, 7 Watts, 152; Bowman v. Coffroth, 59 Pa. 19; Ormerod v. Dearman, 100 Pa. 561. In the last case, the present chief justice, referring to the authorities, said: " They establish the principle that contracts, which have for their subject-matter any interference with the creation of laws, or their due enforcement, are against public policy, and therefore void."

In Trist v. Child, 21 Wall. 441, the validity of a contract to procure the enactment of a law, authorizing the payment of a private claim, was fully considered by the Supreme Court of the United States. After referring to Clippinger v. Hepbaugh, supra, and three other American cases, viz., Harris v. Roof's Ex'r, 10 Barb, 489; Rose v. Truax, 21 Id. 361; Marshall v. R. R. Co., 16 How. 314, in all of which such contracts were held to be against public policy, that court said: " We entertain no doubt that in such cases, as under all other circumstances; an agreement, express or implied, for purely professional services, is valid. Within this category are included, drafting the petition to set forth the claim, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them, orally or in writing, to a committee or other proper authority, and other services of like character. All these things are intended to reach only the reason of those sought to be influenced. They rest on the same principle of ethics as professional services rendered in a court of justice, and are no more exceptionable. But such services are separated by a broad line of demarcation from personal solicitation, and other means and appliances, such as the correspondence shows were resorted to in this case. There is no reason to believe that they involved anything corrupt or different from what is usually practiced by all paid lobbyists in the prosecution of their business."

After showing that the prohibition against contracts to procure either general or private legislation rests upon a solid

foundation, the court further says : " To legalize the traffic of such services would open a door at which fraud and falsehood would not fail to enter and make themselves felt at every accessible point. It would invite their presence and offer them a premium. If the tempted agent be corrupt himself, and disposed to corrupt others, the transition requires but a single step. He has the means in his hands, with every facility and a strong incentive to use them. The widespread suspicion that prevails, and charges openly made, and hardly denied, lead to the conclusion that such events are not of rare occurrence. Where the avarice of the agent is inflamed by the hope of a reward contingent upon success, and to be graduated by a percentage upon the amount appropriated, the danger of tampering in its worst form is greatly increased. It is by reason of these things that the law is as it is upon the subject. It will not allow either party to be led into temptation where the thing to be guarded against is so deleterious to private morals, and so injurious to the public welfare."

" We have said that for professional services in this connection a just compensation may be recovered. But, where they are blended and confused with those that are forbidden, the whole is a unit and indivisible. That which is bad destroys that which is good, and they perish together. Services of the latter character, gratuitously rendered, are not unlawful. The absence of motive to wrong is the foundation of the sanction. The tendency to mischief, if not wanting, is greatly lessened. The taint lies in the stipulation for pay. Where that exists, it affects fatally, in all its parts, the entire body of the contract."

The principle under consideration is not restricted to contracts involving the procurement of legislation for a contingent compensation. It has been frequently recognized and applied in other transactions involving questions of public policy. Some of the instructive cases in which that has been done are the following: Tool Co. v. Norris, 2 Wallace, 48, 56 ; Oscanyan v. Arms Co., 103 U. S. 261 ; Woodstock Iron Co. v. Extension Co., 129 U. S. 643. In the first of these, an agreement, for compensation, to procure a contract from the government to furnish its supplies, was held to be against public policy, and could not be enforced. Mr. Justice FIELD, delivering the opinion of the court in that case, said: " The principle which

determines the invalidity of the agreement in question has been asserted in a great variety of cases. It has been asserted in cases relating to agreements for compensation to procure legislation. These have been uniformly declared invalid, and the decisions have not turned upon the question whether improper influences were contemplated or used, but upon the corrupting tendency of the agreements. . . . Agreements for compensation contingent upon success, suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception."

As has been seen by reference to plaintiff's testimony, the contract in suit contemplated the procurement of the "legislative mandate," compelling the post-office department to recognize certain claims which had theretofore been considered and rejected. The procurement of that legislation was the burden of plaintiff's undertaking. He has explained the difficulties encountered in accomplishing it, as well as the reasons therefor. The undisputed facts of the case bring it within the principle recognized in the authorities above cited, and defendant's second point should have been affirmed.

Judgment reversed.