## Peyton *v.* Margiotti, Appellant.

Argued October 6, 1959. Before Jones, C. J., Bell, Jones, Cohen, Bok and McBride, JJ.

88

*Samuel L. Goldstein,* with him *Alexander L. Suto,* and *Suto, Power, Goldstein & Walsh,* for appellant.

*J. I. Simon,* with him *James A. Danahey,* for appellees.

OPINION BY MR. JUSTICE BOK, December 30, 1959:

In 1947 Charles J. Margiotti, Esquire, defended Charles Peyton against a charge of felonious homicide. The result was a conviction of murder in the second degree, which, with a recommendation of mercy, led Chief Justice MAXEY to remark at the end of his opinion of affirmance, at 360 Pa. 441 (1948), that Peyton's escape from a worse fate "cannot be attributed to any weakness in the Commonwealth's case." The ensuing sentence was from ten to twenty years in the penitentiary.

For his services Margiotti received $13,580, including a payment of $5000 which is the subject of the instant suit, and spent $4209 in costs.

In 1954 Peyton's brother Edward read in the paper that the Pardon Board had agreed to release Charles. On September 27th he met his nephew, the plaintiff, who had a certified check from his savings and loan association for $5000, and together they went to Margiotti's office. Edward Peyton's name is on the back of the check, together with that of plaintiff's counsel, because Margiotti refused to take the check, even in escrow, and plaintiff had to go out and, with proper identification, have it cashed. The money was then given to Margiotti, who agreed that Peyton would get it back if his brother was not released from prison by

Christmas. Margiotti took the money, left his office, and shortly after his return a girl came in with a receipt reading: "Received of Thomas Peyton $5000., acct. services trial and Pardon Board Com. v. Peyton." It was signed with Margiotti's firm name, by Florinda R. Sirianni, bookkeeper, and handed to Thomas Peyton.

Margiotti had successfully argued the case before the Pardon Board, and all that stood between Charles Peyton and freedom was the Governor's signature. The Governor, however, withheld it and Peyton remained in prison not only over Christmas but for some time thereafter. In 1955 the family both wrote and visited Margiotti and demanded return of the money according to the oral contract, since their father had not been released by Christmas, but were refused. Margiotti died in 1956 and plaintiffs brought suit against his Estate. The jury found in their favor for the full amount and interest. The defense was that Margiotti had been underpaid and that the $5000 was an unequivocal fee.

Defendant's main point is that the contract was contingent and against public policy. We agree that it was, since it was more than a straight bargain for hiring a lawyer to make an argument. Although raised first before the court en banc below, this question must be considered whether raised then or now: *Waychoff v. Waychoff*, 309 Pa. 300 (1932), 163 A. 670.

Contingent fees, whether in civil or criminal cases, are a special concern of the law. A proper fee in a civil suit, where the client is not taken advantage of, is valid: *Klauder v. Cregar*, 327 Pa. 1 (1937), 192 A. 667. Such fee contracts are specially dealt with in Procedural Rule 202 and must be in writing, duplicate, and kept for two years, subject to inspection. And the Restatement, Contracts, Section 542, declares them illegal if it is also part of the bargain that the party

seeking to enforce the claim shall pay the expenses or the owner of the claim shall not settle or discharge it.

In criminal cases the rule is stricter because of the danger of corrupting justice. The second part of Section 542 of the Restatement reads: "A bargain to conduct a criminal case or a proceeding for divorce or annulment of marriage in consideration of a promise of a fee contingent on success is illegal, but a bargain to endeavor to enforce by litigation or otherwise any other kind of claim in consideration of such a promise is not, because of that single fact, illegal."

Sections 559 to 568 of the Restatement proscribe bargains to influence public officials or public action, and Section 561 deals as follows with securing a pardon: "A bargain to procure a pardon or to solicit by personal influence the granting of a pardon, is illegal; but a bargain to prepare a petition for a pardon and to make an argument in support of it before the pardoning power, is not illegal."

As for the cases on the subject, we do not think that the law has been better stated since *Hatzfield v. Gulden*, 7 Watts 152 (1838), when this Court was under the Chief Justiceship of the great GIBSON. Justice HUSTON said, in the good language of the day, that "the proof in the cause was various, and not a little of it," and it involved a contract to procure signatures to a petition to the governor for a pardon. He said: "The power to pardon may be considered as a part of the penal code for the state; it operates after trial to be sure, generally; but may be exercised before. It is as important that it should be free from bias, or prejudice, or crime, as that the trial should be so. No man would say, that if it were possible to procure a pardon by direct payment to a governor, it would be lawful to give one. To bribe others to deceive and impose on him, only differs in degree. . . . all contracts to change the course of trials, or the effects of trials, whether to

obtain a liberation of a prisoner by money to the jailer, or to obtain a pardon by the use of money, directly or indirectly, must be void."

No other case deals directly with the pardoning or commuting power, but the analogy of a bargain to obtain legislation is apt. In *Clippinger v. Hepbaugh*, 5 W. & S. 315 (1843), Justice ROGERS said that "a contract to procure the passage of an Act of the Legislature, by any sinister means, or even by using personal influence with the members, would be void, as being inconsistent with public policy and the integrity of our political institutions." This case and others were cited to the same effect in *Spalding v. Ewing*, 149 Pa. 375 (1892), 24 A. 219, 15 L.R.A. 727, 34 Am. St. Rep. 608.

Directly in point is *Bowman v. Coffroth*, 59 Pa. 19 (1868), where the effort was to have a man discharged from the draft. Justice READ said: "The cases cited by the defendant in his paperbook, to which may be added Marshall v. Ohio Railroad Company, 16 Howard 314, establish that a contract to procure a pardon from the governor of a convict would now be held illegal whether improper means were used or not; so to procure the passage of a private statute, or to procure an appointment to office by private influence, or to purchase the right of administration, are all held to be illegal and void.

"In principle it is difficult to perceive any material distinction between these cases and the one before us, which is an application in person to the war department for the discharge of a drafted man, and for which if successful a contingent compensation is to be paid. It is more consistent with morality and sound policy to consider it covered by the rule established in similar cases, and we therefore hold it illegal and void."

In *Kuhn v. Buhl*, 251 Pa. 348 (1916), 96 A. 977, we said: " 'Whether a contract is against public policy is a question of law for the court to determine from

all of the circumstances in each case.'" We have no hesitation in declaring that an agreement between an attorney and a layman that is wholly contingent upon the success of a petition for commutation is against public policy.

But the law would fall short if it only left the parties where it found them. These parties were not equal, and the maturity of the law has evolved a qualification in the *Hatzfield* rule where agent and principal, and especially attorney and client, are not considered to deal at arm's length. It appears in *Smith v. Blachley*, 188 Pa. 550 (1898), 41 A. 619, where this court said: "'While the courts will not enforce an illegal contract, yet if . . . [an] agent . . . has, in the prosecution of an illegal enterprise . . . received money . . . belonging to the master, he is bound to turn it over to him, and cannot shield himself from liability therefor upon the ground of the illegality of the original transaction.'"

In Pennsylvania Law Encyclopedia, Vol. 8, 109, under "Contracts" this appears: "When the parties to a contract against public policy or otherwise illegal are not in pari delicto, or equally guilty, and when public policy is considered as advanced by allowing either, or at least the more excusable of the two, to sue, relief may be granted."

The modern notion of disparate confidences appears to best advantage in *Berman v. Coakley*, 243 Mass. 348 (1923), 137 N.E. 667, where Chief Justice Rugg said: "It is a doctrine so well settled as not to be open to discussion that courts will not aid in the enforcement, nor afford relief against the evil consequences, of an illegal or immoral contract. One branch of that general principle is that a private agreement made in consideration of the suppression of a criminal prosecution will neither be enforced nor abrogated by a court of equity. That doctrine is founded upon the

public policy that the course of justice cannot be defeated for the benefit of an individual . . . The general doctrine is subject to a qualification or exception as widely recognized and as thoroughly established as is the rule itself. That exception is that, where the parties are not in equal fault as to the illegal element of the contract, or, to use the phrase of the maxim, are not in pari delicto, and where there are elements of public policy more outraged by the conduct of one than the other, then relief in equity may be granted to the less guilty. . . . The defendant is an attorney-at-law, and, in dealing in this manner with one whom he makes his client, the parties are not regarded as in pari delicto . . . An attorney-at-law has been said to be a public officer. He is an officer of the court sworn to aid in the administration of justice and to act with all good fidelity both to his clients and to the court. The public have a deep and vital interest in his integrity. . . The attorney and client do not deal with each other at arms' length. The client often is in many respects powerless to resist the influence of his attorney . . . The attorney is not permitted by the law to take any advantage of his client."

We therefore feel that despite the essential invalidity of the contingent fee agreement the law should be allowed to favor the plaintiffs because of the circumstances.

Only two minor points remain.

Defendant contends that the receipt was an exclusive memorial and hence that parol evidence should not be allowed to enlarge it. There are two answers. One is that defendant's counsel, perhaps unwarily, admitted that the receipt was only the best evidence of the contract and not the contract itself. The other is that a receipt is merely a written admission of an independent transaction unless it is the very act of the parties, like a discharge, a release, or a new obliga-

tion: *Wagner v. Marcus*, 288 Pa. 579 (1927), 136 A. 847; Wigmore on Evidence, Sec. 2432, pp. 104-105. The instant receipt is by no means the very act of the parties but only an obvious acknowledgment of money received and earmarked. Besides, it was not signed by the parties or either of them; it was signed only by a bookkeeper who worked under the charge and supervision of Margiotti's personal secretary.

It may well be that Margiotti was scantily paid for achieving rather spectacular results, and had the Governor signed Charles Peyton's commutation this suit would not have been undertaken. But after a fair and impartial trial and with all of the facts before them, the jury decided what the arrangement was, and that is the end of the matter.

The final point is plaintiffs', that interest should run from the first moment after failure of the contractual condition. This would be the day after Christmas, 1954. The jury allowed interest only from date of demand, which they fixed as the impetration of the writ, August 21, 1957, at the figure of $350.

When interest is not expressly provided for, or when no date for payment of the principal obligation is set, it is not easy to decide precisely when interest shall begin to run. Basically it is never demandable unless money be unlawfully withheld: *Stewart v. Stocker*, 13 S. & R. 199 (1825). Then it is due and interest runs from the date of withholding: *Barium Steel Corp. v. Wiley*, 379 Pa. 38 (1954), 108 A. 2d 336. More specifically, the due date occurs upon the happening of a contingency when one is in contemplation of the parties or is part of their contract: *Palmgreen v. Palmer's Garage, Inc.*, 383 Pa. 105 (1955), 117 A. 2d 721; *Estate of Joseph Fleming*, 184 Pa. 80 (1898), 39 A. 27; *Estate of Catherine O'Brien*, 103 Pa. Superior Ct. 160 (1931), 158 A. 319.

We see no difference in principle between a contingency that occurs and starts the running of interest, on the one hand, and the failure of a contingency to happen when, on the other hand and as here, the contract was framed with reference to the failure of the contingency to occur.

We therefore hold that Margiotti owed plaintiffs their money at once after Christmas, when the contingency failed, and that interest ran with the debt from December 26, 1954. A petition to mold the verdict was filed, and there is no conflict over the arithmetic. The item of interest should be $1133.33 instead of $350.

We may mold a verdict in a proper case, even after verdict: *Maize v. Atlantic Refining Co.*, 352 Pa. 51 (1945), 41 A. 2d 850; even to increase the verdict by adding interest; *Nagle Engine & Boiler Works v. Erie*, 350 Pa. 158 (1944), 38 A. 2d 225; *Norristown-Penn Trust Co. v. Middleton*, 300 Pa. 522 (1930), 150 A. 885.

As modified in the matter of interest, the judgment is affirmed and is entered for the plaintiffs in the sum of $6133.33.

---

CONCURRING OPINION BY MR. JUSTICE BELL:

I disagree with the public policy rule enunciated by the majority. Contingent fees in both civil and criminal cases have, in my judgment, been greatly abused, with resulting grave injustice to clients who are poor, needy and/or injured. Especially is this so where an attorney charges a contingent fee of 30% to 50% in negligence cases in which the risk of loss, experience shows, is negligible. However, I regard the contingent fee as a necessity for a poor man. A poor man is entitled to representation by a lawyer of his choice, whom he considers able or very able. In many civil and criminal cases a poor person is unable to engage such a lawyer except on the basis of a contingent fee. Provided

such a fee is fair and reasonable,* I believe that realistically it is both proper and necessary.

With respect to the Board of Pardons, the Board requires, and for many years has required, the petitioner to state the fee which he has paid or has agreed to pay his attorney, and this would include a contingent fee or a fee partly paid and partly contingent. If the Board of Pardons considers the fee to be unfair to the client, or to indicate that it is being charged because of the attorney's *supposed* influence with the Board of Pardons, the Board has the power to remedy the situation by refusing to hear the petition, or by refusing to permit that particular attorney to argue the case; and it probably has other disciplinary powers with respect to any improper or inordinate fee.

While the majority and I desire to achieve the same results, I cannot agree with them that a *fair* contingent fee in a Board of Pardons case is per se against public policy.

If the fee of $5,000—contrary to the tenor of the receipt "Acct. Services Trial and Pardon Board. Com. v. Peyton"—was for services solely for obtaining a pardon by Christmas, it was obviously unreasonable. However, we all know that Margiotti's death prevented his presenting his version of the agreement. Nevertheless, the jury believed plaintiffs' witnesses; the lower Court approved the jury's verdict; and since I find neither palpable abuse of discretion nor error of law, I would affirm the judgment.

Mr. Justice McBride joins in this concurring opinion.

---

* Taking into consideration all the factors which are or should be taken into consideration in the particular case.