The People of the State of New York, Respondent, v
Richard Winkler, Appellant.

Second Department, May 11, 1987

## APPEARANCES OF COUNSEL

*Robert N. Isseks* for appellant.

*Carl A. Vergari, District Attorney (Diane E. Selker* and *Anthony J. Servino* of counsel), for respondent.

## OPINION OF THE COURT

MOLLEN, P. J.

The primary issue presented by this appeal is whether the existence of a contingency fee arrangement such as in the case at bar between the defendant and his attorney in a criminal case constitutes a denial of the defendant's constitutional right to counsel (US Const 6th Amend; NY Const, art I, § 6). We hold that such an arrangement violates the defendant's constitutional rights, as a matter of law, and accordingly grant the defendant's motion to vacate the judgment of conviction and order a new trial.

The defendant was charged along with an accomplice, Merrill Williams, with the crimes of murder in the second degree and criminal possession of a weapon in the fourth degree. The indictment charged that the defendant, while acting in concert with Williams, intentionally caused the death of the defendant's father, Irving Winkler, on August 2, 1980. According to the People's case, the defendant, Williams and one

Robert Gruber had driven to the defendant's North Tarrytown home in the early morning hours of August 2, 1980. Gruber, who testified on behalf of the prosecution, remained in the car, which was parked a block or two away from the house, while the defendant and Williams entered the house. Approximately 45 minutes later, Gruber heard sounds like firecrackers. Shortly thereafter, the defendant and Williams returned to the car. Williams was holding a rifle wrapped up in a tee shirt and placed the rifle in the trunk of the car. The defendant told Gruber, "you don't know anything" and then turned to Williams and asked, "what do you want?" When Williams indicated that he wanted $10,000, the defendant replied, "You can have anything but my car". While driving home, Williams stated, "I can't believe it" and "I can't believe I shot him". Several youths from the neighborhood also testified that on July 31, 1980, another youth had given Williams a .22 caliber rifle similar to that of the murder weapon.

The defendant took the stand on his own behalf and testified that Williams had given him a .22 caliber rifle on July 31, 1980, which he asked the defendant to store in his house. The next day, the defendant and Gruber were together during the late evening hours snorting cocaine and smoking marihuana. The two men then met Williams at approximately 1:30 A.M. on August 2, 1980. During their conversation, Williams apparently demanded $100 from the defendant representing money the defendant owed him. The three men then drove to the defendant's home in North Tarrytown so that the defendant could get the money. Williams accompanied the defendant into the house and asked the defendant for the return of his rifle. The defendant complied. While the defendant was looking for money in his bedroom, Williams apparently wandered through the house and entered Irving Winkler's bedroom. The defendant then heard two gunshots. Williams came out of the bedroom holding money and told the defendant to leave with him. The defendant stated that on the way back to the car, Williams threatened to kill the defendant and his mother if the defendant said anything about the shooting.

Following a joint jury trial, the defendant and Williams were convicted of murder in the second degree. On October 30, 1981, the defendant was sentenced to 25 years to life imprisonment. The defendant filed a notice of appeal from his judgment of conviction.

While the appeal was pending, the defendant moved to vacate the judgment of conviction pursuant to CPL 440.10

based on a claim of ineffective assistance of counsel. In his moving papers, the defendant revealed for the first time that his trial counsel had represented him pursuant to a contingency fee retainer agreement. According to the moving affidavits, the defendant's mother, Lanie Sattler, and grandmother, Annie Winkler, entered into a written agreement with trial counsel's law firm to retain it for the representation of the defendant in defense of this indictment. The retainer agreement, which was executed at the law firm's offices, provided as follows:

"RETAINER AGREEMENT dated this 28th day of October, 1980, by and between LANIE SATTLER, residing at One Century Tower, Fort Lee, New Jersey, and ANNIE WINKLER, residing at 1920 Scheiffelin Avenue, Bronx, New York, and [trial counsel].

"WHEREAS, LANIE SATTLER desires to retain [trial counsel's law firm] to represent her son, RICHARD WINKLER, on a pending charge in Westchester County County Court; and

"WHEREAS, [trial counsel's law firm] agrees to accept said retainer; and

"WHEREAS, ANNIE WINKLER, grandmother of RICHARD WINKLER, agrees to assist in the payment of legal fees.

"NOW, THEREFORE, it is agreed as follows:

"FIRST: The fee for legal representation shall be paid as follows:

"(a) $2,000.00 on execution hereof, receipt of which is hereby acknowledged;

"(b) $18,000.00 to be paid by ANNIE WINKLER from a bequest to be received from the Estate of Irving Winkler, at such time as said bequest is received.

"SECOND: It is agreed that any disbursements for investigation or psychiatric examinations, etc., shall be in addition to the above fees.

"THIRD: It is agreed that the within retainer is for the trial only, and will not include any appeals, if necessary.

"FOURTH: ANNIE WINKLER has been advised and understands that in the event that RICHARD WINKLER is convicted in Westchester County Court, that she would stand to inherit the entire estate of Irving Winkler (subject to any objections by other interested parties).

"FIFTH: ANNIE WINKLER agrees that said money shall be paid by her heirs, executors, administrators and assigns in the event of her death prior to payment of said fees.

"SIXTH: *It is understood and agreed, subject to the approval of richard winkler, that in the event richard winkler is acquitted or found not guilty by reason of insanity, or some other legal reasons, and inherits from the Estate of Irving Winkler, that RICHARD WINKLER shall pay, as additional legal fees, the sum of $15,000.00"* (emphasis added).

On November 5, 1980, trial counsel visited the defendant at the Westchester County Jail and presented the retainer agreement to him for his signature. Before signing the agreement, the defendant crossed out the $15,000 figure set forth in paragraph SIXTH of the agreement and inserted the figure of $25,000 in its place.

The defendant argues that the aforesaid contingency fee arrangement, which was in violation of Code of Professional Responsibility DR 2-106 (C), establishes a per se denial of his right to effective assistance of counsel. Thus, the defendant asserts that the judgment of conviction must be vacated even in the absence of a showing of actual prejudice. The defendant also maintains that he was actually and substantially prejudiced by counsel's performance at trial as a result of counsel's conflict of interest. For example, the defendant argues that counsel improperly failed, *inter alia,* to request the submission of the lesser included offenses of manslaughter in the first and second degrees to the jury for its consideration, to adequately advise the defendant as to whether or not he should testify on his own behalf, and to pursue an intoxication defense. These alleged errors in defense counsel's representation, the defendant argues, were due to counsel's financial interest being solely dependent upon a complete acquittal of all charges rather than a possible conviction of a lesser count.

The County Court (Marasco, J.)* denied the defendant's CPL 440.10 application without a hearing. At the outset, the court determined that it was unnecessary for it to pass on the legality of the retainer agreement or any ethical issues involved. The court also rejected the defendant's contention that the contingency fee arrangement constituted a per se violation of his constitutional right to counsel. Applying the standards set forth in *People v Baldi* (54 NY2d 137) which are utilized to determine whether an accused was denied adequate and meaningful representation of counsel at trial, the court deter-

---

* The Judge presiding over the defendant's trial (Martin, J.) had become a Justice of the Supreme Court before the time the defendant's CPL 400.10 application was made. Accordingly, the motion was referred to Judge Carmine C. Marasco of the County Court.

mined that the defendant was not deprived of his right to effective assistance of counsel.

We first address the People's contention that the retainer agreement between the defendant and his trial counsel did not constitute a contingency fee arrangement. The People interpret the agreement as providing for a set fee of $45,000 of which the attorney agreed to accept $20,000 from the defendant's grandmother, and to hold the defendant responsible for the balance of the fee only if he inherited from his father's estate. Thus, the People assert that it was not the fee or the amount thereof which was contingent on the outcome of the case, but rather it was counsel's ability to collect the agreed fee that was in question. We reject this contention. In civil litigation, contingency fees most commonly represent an arrangement between the attorney and client whereby the attorney agrees to represent the client with compensation to be a percentage of the amount recovered (see, Black's Law Dictionary 741 [4th ed]). A bargain to conduct a criminal case in consideration of a fee in any degree contingent upon success or a particular outcome is also a contingency fee (see, Restatement of Contracts § 542 [2]). Thus, paragraph SIXTH of the retainer agreement involved in this case sets forth a contingency fee, since the $25,000 sum to be paid by the defendant was entirely contingent upon his acquittal of all charges arising out of his father's killing which, in turn, could permit him to inherit from his father's estate (see, Riggs v Palmer, 115 NY 506).

We further find that the instant retainer agreement is unethical as it is in violation of the Code of Professional Responsibility. Specifically, Code of Professional Responsibility DR 2-106 (C) provides: "[a] lawyer shall not enter into an arrangement for, charge, or collect a contingent fee for representing a defendant in a criminal case". Code of Professional Responsibility EC 2-20 similarly states that: "[p]ublic policy properly condemns contingent fee arrangements in criminal cases, largely on the ground that legal services in criminal cases do not produce a res with which to pay the fee". This prohibition is a further recognition of the fact that contingency fees, particularly in criminal cases, present an inherent danger of corrupting justice (see, Peyton v Margiotti, 398 Pa 86, 156 A2d 865, 867).

In the case at bar, the defendant's trial counsel was obviously guilty of unprofessional and unethical conduct by entering into the aforesaid contingency fee agreement. In view of

this flagrant violation of the Code of Professional Responsibility, we are forwarding a copy of our decision along with a copy of the contingency fee contract to the Grievance Committee for consideration and appropriate action. In doing so, however, we note that the fact that counsel's conduct violated a provision of the Code of Professional Responsibility does not, in and of itself, necessarily warrant a finding of ineffective assistance of counsel (see, Morrow v State, 219 Kan 442, 548 P2d 727; Schoonover v State, 218 Kan 377, 543 P2d 881, cert denied 424 US 944).

■ We now turn to the primary issue on appeal, namely, whether the defendant's constitutional right to counsel was violated, as a matter of law, by the contingency fee arrangement. It is well established that the constitutional right to counsel is a right to the effective assistance of counsel, meaning the reasonably competent assistance of an attorney acting as a diligent, conscientious advocate with undivided loyalty throughout the critical stages of a criminal proceeding (see, Cuyler v Sullivan, 446 US 335; Holloway v Arkansas, 435 US 475; United States v Wade, 388 US 218; Glasser v United States, 315 US 60). Concomitantly, a defense counsel, whether appointed or retained, is generally prohibited from representing conflicting interests or undertaking the discharge of inconsistent obligations (see, Cuyler v Sullivan, supra). "Undivided allegiance and faithful, devoted service to a client are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision" (Von Moltke v Gillies, 332 US 708, 725-726).

Most conflicts of interest in criminal litigation occur in situations involving an attorney's dual representation of codefendants. While joint representation of multiple defendants does not constitute a per se violation of a defendant's constitutional right to counsel, the courts have emphasized that the Trial Judge should provide sufficient admonition to the defendants of the potential pitfalls of joint representation, so that the defendant's right to counsel is adequately safeguarded (see, Glasser v United States, supra; People v Macerola, 47 NY2d 257; People v Gomberg, 38 NY2d 307). These cases reflect the sensitivity of the judiciary to its obligation to safeguard a defendant's right to effective representation whenever counsel is in such a position that the caliber of his or her services may be substantially diluted or the direction of his or her efforts diverted. Thus, in People v Gomberg (supra, at 313-314), the Court of Appeals directed that before the formal commence-

ment of trial, the Trial Judge has a responsibility to ascertain on the record whether each defendant represented by the same attorney has an awareness of the potential risks involved in that course and has knowingly chosen it. If a Trial Judge fails to conduct a *Gomberg* inquiry, the judgment of conviction will be reversed upon a showing by the defendant that a conflict of interest, or at least a significant possibility thereof, existed between himself or herself and defense counsel *(see, People v Macerola, supra)*.

This same rationale was recently applied by the Court of Appeals in *People v McDonald* (68 NY2d 1) which involved an attorney's concurrent representation of a defendant charged with arson and the corporation whose building the defendant was alleged to have damaged. In that case, the defendant urged the court to adopt a per se approach to the effect that a defense counsel's concurrent representation of both the defendant and the victim constituted the denial of the accused's right to effective assistance of counsel as a matter of law. The *McDonald* court specifically rejected the defendant's per se approach and ruled that if the trial court fails to conduct a *Gomberg* inquiry on the record to determine whether the defendant is aware of the potential conflicts which exist in concurrent representation situations, the judgment of conviction will be reversed upon a showing by the defendant that a conflict, or at least a significant possibility thereof, did exist *(People v McDonald, supra,* at 9, quoting from *People v Lombardo,* 61 NY2d 97, 103; and *People v Macerola, supra,* at 264). In a footnote, the *McDonald* court underscored the fact that this standard does not require the defendant to prove actual prejudice. Rather, the court stated that: "[i]t will be sufficient, absent the required inquiry and consent, that a substantial possibility of prejudice existed" *(People v McDonald, supra,* at 11, n 5).

The trial court in *McDonald (supra)* failed to conduct a *Gomberg* inquiry. Based upon the facts of that case, the Court of Appeals ruled that this error required reversal because the defendant demonstrated the existence of a conflict. Although the corporation, whose building the defendant was alleged to have damaged, had disclaimed any economic interest in the outcome of the criminal prosecution, the Court of Appeals noted that the testimony of one of the prosecution's main witnesses, the corporation's secretary-treasurer, concerning the defendant's employment relationship with the company, was an integral part of the prosecution's case. "Indeed, the

prosecutor foreshadowed this evidence of motive in his opening statement and made full use of it in summation. Under these circumstances, defendant was entitled to be informed by the Trial Judge that his attorney's representation of the company placed counsel in a 'very awkward position' in deciding whether and how best to impeach [the secretary-treasurer's] trial testimony" *(People v McDonald, supra,* at 12). In view thereof, the Court of Appeals held that the trial court's failure to conduct a *Gomberg* inquiry was reversible error *(see also, People v Mattison,* 67 NY2d 462, *cert denied —* US —, 107 S Ct 571 [in the absence of a *Gomberg* inquiry, the defendant established the existence of a conflict which resulted in the denial of his right to counsel by reason of the fact that a partner in the firm at which the defendant's attorney was employed still represented the codefendant, who had pleaded guilty in exchange for testifying against the defendant]; *cf., People v Lombardo, supra* [although the trial court erred in failing to conduct a *Gomberg* inquiry, the defendant failed to establish that the defense counsel's previous representation of the People's chief witness on various criminal charges resulted in a conflict of interest or a significant possibility thereof]; *People v Whaley,* NYLJ, Apr. 14, 1987, at 16, col 4).

We conclude that given the unique conflict of interest arising in contingency fee cases of this nature, reversal is necessary. In the first instance, it is significant to note that unlike the conflict of interest cases described above where a trial court has an opportunity to ensure on the record that the defendant is aware of the potential conflicts of interest involved, in cases such as that now before us, a Trial Judge would virtually never be aware of the contingency fee arrangement either during pretrial or trial proceedings since it is in the defense counsel's interest to avoid the disclosure of the unethical agreement. Thus, a *Gomberg* inquiry would not occur in a contingency fee case so as to alert the defendant of the conflict-ridden relationship which exists between himself or herself and defense counsel.

A second and perhaps more profound fact which distinguishes contingency fee cases of this type from other conflict of interest cases, is the nature of the conflict itself. In contingency fee cases such as that at bar, a conflict or a significant possibility thereof necessarily arises directly between the defendant and his or her counsel since the defendant's constitutional right to counsel is inherently and consistently pitted

against defense counsel's monetary interest *(see, People v Barboza,* 29 Cal 3d 375, 173 Cal Rptr 458, 627 P2d 188, 189-190). In contrast, the conflict in joint representation cases arises, if at all, between and/or among the multiple defendants and does not necessarily implicate the attorney-client relationship. The conflict which might arise in concurrent representation cases, while somewhat similar to that in contingency fee cases, is distinguishable on the basis that the conflict therein is not always as direct and unequivocal as that in contingency fee cases. The Court of Appeals in *People v McDonald* (68 NY2d 1, 10, *supra)* described the potential conflict in concurrent representation cases as follows: "The *victim* of a crime * * * *may* well have an economic interest in the outcome of the criminal prosecution, creating duties on the part of his or her attorney which inherently conflict with the duties owed to the accused" (emphasis added).

Thus, the *McDonald* court impliedly recognized that even when an attorney serves two masters, namely, the defendant and the victim, it is conceivable that no conflict of interest, or a significant possibility thereof, will arise between the accused and his or her attorney. In view of this factual possibility, it is appropriate to require the defendant, who seeks to have his or her conviction set aside on the basis that defense counsel was also representing the victim, to demonstrate that a conflict existed.

The existence of a contingency fee agreement, such as that at bar, however, inevitably creates a real, ever present and insoluble conflict between the defendant and his or her attorney thereby threatening the sanctity of the attorney-client relationship at its very root *(see, United States v Hurt,* 543 F2d 162, 167). The scope and depth of the conflict created by the contingency fee agreement is substantial. The real vice of such an agreement occurs in the consideration of various strategic and tactical decisions which confront counsel throughout the trial proceedings. For example, what if before or during the trial in the case at bar, the defendant was offered a favorable plea bargain permitting him to plead guilty to a lesser included offense of manslaughter in the first or second degree? Assuming no offer of a plea bargain was made by the prosecution, should the defense counsel have initiated or attempted to initiate a discussion with a view towards obtaining a plea bargain? Would counsel be motivated to advise the defendant as to the benefits of such a bargain given the strength of the evidence against him, if in doing so,

counsel would be foregoing all possibility of the contingency fee? How objective could counsel be in advising the defendant of potential defenses to second degree murder which would result in a conviction of a lesser included offense knowing that such an outcome would result in the forfeiture of the $25,000 contingency fee? The attorney's financial interest in a complete acquittal necessarily negates any motivation on counsel's part to explore a favorable plea bargain for his client or to put forth mitigating defenses which would support a conviction of a lesser included offense.

Moreover, even if we were to assume that the defendant, prior to executing a contingency fee arrangement, had adamantly professed his innocence of the charged crimes to counsel and stated unequivocally that he was only interested in a complete acquittal of all charges rather than a conviction of possible lesser counts, we would still be compelled to conclude that the defendant's constitutional right to counsel was violated as a matter of law. The dynamics of a criminal case are such that the defense is frequently required to change its original trial strategy in response to various circumstances which arise during the course of the trial. As the trial progresses, for example, the prosecution's case may appear stronger than the defense originally anticipated, thereby compelling the defendant and his or her attorney to seriously reconsider their original strategy to strive for a complete acquittal of all charges and to contemplate the availability of potential mitigating defenses which, if successful, would result in a conviction of a lesser offense. Counsel's advice to the defendant regarding these tactical decisions must be unfettered, free of self-interest and directed solely towards the advancement and vindication of his or her client's legal rights and the furtherance of any opportunity that may be in the client's best interests rather than counsel's financial advancement.

In contingency fee cases of this nature, however, a conflict-of-interest shadow is cast inherently over the attorney-client relationship which seriously threatens the defendant's constitutional right to meaningful, effective and unbiased legal advice from counsel. In the case at bar, for example, the defendant was constitutionally entitled to advice from his counsel, not affected in any way by the counsel's financial interest, with regard to the potential use of an intoxication defense and/or the submission of lesser included offenses to the jury. The prosecution argues that the defense counsel's

decision not to raise an intoxication defense or request the submission of lesser counts to the jury did not constitute ineffective assistance of counsel in view of the insufficiency of the evidence to establish that the defendant was so incapacitated that he was unable to appreciate the nature of his actions. Significantly, however, during his testimony, both on direct and cross-examination, the defendant stated several times that he had smoked marihuana and snorted cocaine during the late evening hours of August 1, 1980. The defense counsel did not at any time seek to expand on this portion of the defendant's testimony. This evidence obviously placed the defense counsel in a "very awkward position" *(People v McDonald,* 68 NY2d 1, 12, *supra),* since it provided a basis for the assertion of an intoxication defense on the defendant's behalf which, if successful, would have resulted in the forfeiture of his $25,000 contingency fee. Clearly, the defendant's best interest mandated that such a defense be raised and that the Trial Judge be requested to submit lesser counts for the jury's consideration. The counsel's failure to do so can be directly linked to his financial interest in a complete acquittal of all charges.

In sum, we find that once a defendant establishes that a contingency fee arrangement, such as that at bar, exists between himself or herself and defense counsel, the defendant has met the standard of demonstrating the existence of a conflict or a significant possibility thereof under the standard set forth in *People v McDonald (supra)* and its companion cases. As stated previously, this type of an arrangement necessarily creates a situation wherein a counsel's trial decisions and strategy are inherently overcast with motives which are antithetical to a defendant's basic right to the effective assistance of counsel. Given the significance of this type of conflict, we conclude that there was a denial of the defendant's right to counsel as a matter of law. To this extent, the instant case can be likened to *People v Felder* (47 NY2d 287) wherein the Court of Appeals ruled that when a defendant is unknowingly represented by a person who is not a lawyer, the conviction must be set aside without regard to whether the defendant was individually prejudiced by such representation and regardless of the quality of that representation. In adopting this per se approach, the *Felder* court specifically rejected the position taken by the Appellate Division *(People v Felder,* 61 AD2d 309),* similar to that urged upon us by the prosecution herein, that the defendant's representation by a lay

person, albeit an error of constitutional significance, was nevertheless harmless error under the circumstances of that case. The Appellate Division in *Felder* reviewed, in detail, the representation provided to the defendant by the lay person and concluded that the representation "was most effective, exceedingly thorough and highly professional" *People v Felder, supra,* at 313). Nevertheless, in reversing the Appellate Division, the Court of Appeals in *Felder* stated:

"There can be no doubt that the right to assistance of counsel is an essential ingredient in our system of criminal jurisprudence, rooted deeply in our concept of a fair trial within the adversarial context. It is 'one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and liberty' *(Johnson v Zerbst,* 304 US 458, 462) and as such has been made applicable to the State by reason of the Fourteenth Amendment *(Gideon v Wainwright,* 372 US 335).

"It is precisely this fundamental nature of the right that renders harmless error analysis inapplicable. 'The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.' *(Glasser v United States,* 315 US 60, 76.) Notions of prejudicial impact, overwhelming evidence of guilt and the like, which are the underpinnings of the constitutional harmless error doctrine, are significant in the context of trial errors, e.g., the admission of improperly seized evidence *(People v Almestica,* 42 NY2d 222, *supra)* or the improper admission of the confession of a codefendant who did not take the stand *(Harrington v California,* 395 US 250, *supra).* A denial of the right to assistance of counsel, however, not unlike prosecutorial misconduct, misconduct on the part of the Trial Judge or denial of a public trial, invalidates the trial. As the Supreme Court has recently said, 'this Court has concluded that the assistance of counsel is among those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Chapman* v. *California, supra* [386 US], at 23.' *(Holloway v Arkansas,* 435 US 475, 489.)" *(People v Felder,* 47 NY2d 287, 295-296, *supra.)*

We find this rationale to be equally applicable to the case at bar. The detrimental effect which the existence of a contingency fee agreement has upon a defendant's basic constitutional right to counsel is so substantial that it cannot be treated as a harmless error.

In reaching this conclusion, we recognize that a number of court decisions involving contingency fee agreements in criminal cases which are relied upon by the prosecution have refused to adopt a per se rule and require a defendant to establish that actual prejudice resulted from his or her attorney's conflict of interest in order to obtain a reversal of the judgment of conviction (see, *Downs v State,* 453 So 2d 1102 [Fla]; *Schoonover v State,* 218 Kan 377, 543 P2d 881, *cert denied* 424 US 944, *supra; State v Labonville,* 126 NH 451, 492 A2d 1376; *Fuller v Isreal,* 421 F Supp 582). In each of these cases, the court, following an evidentiary hearing on the defendant's motion to set aside the judgment of conviction, reviewed the defense counsel's trial performance to determine whether it met the standard of meaningful and effective legal representation required by the Sixth Amendment. Adopting this same approach, the County Court herein applied the well-established standard of review for claims of ineffective assistance of counsel set forth in *People v Baldi* (54 NY2d 137, *supra)* and determined that the defense counsel's performance at trial satisfied constitutional requirements.

Aside from our basic disagreement with the application of a harmless error approach in cases of this nature, we find the aforesaid approach to be flawed in that it presumes that prejudice resulting from a defense counsel's financial conflict of interest can be fairly detected by the review of a bare record. This assumption, however, ignores the fact that the conflict which exists in cases of this nature may result in prejudice arising from attitudes or conduct which are subtle, intangible, tenuous, subconscious or incapable of being evidenced in the record, such as in the nature of the advice which is given or withheld. "A reviewing court deals with a cold record, capable, perhaps, of exposing gross instances of incompetence but often giving no clue to the erosion of zeal which may ensue from divided loyalty" *(Castillo v Estelle,* 504 F2d 1243, 1245). Even if counsel, at a hearing on a motion to vacate the judgment of conviction, provides good-faith assurances that he or she did everything he or she could to advance his or her client's interest and did not exploit any opportunities during the criminal proceedings to advance his or her own pecuniary interest, a court would be incapable of verifying that counsel so restrained himself or herself. In *Holloway v Arkansas* (435 US 475, 490-491, *supra),* the United States Supreme Court, focusing on the attorney's role in the plea bargaining function alone, noted: "it would be difficult to

judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible". Similarly, how can a trial or appellate court fairly and accurately identify the motives, selfish or altruistic, hidden or express, behind the numerous decisions made by counsel preceding and during a criminal trial where he or she has a contingency fee arrangement with the accused? The inescapable fact is that neither a defendant nor a reviewing court will have any way of effectively determining whether counsel's advice and conduct at trial was affected, no matter how slightly, by his or her pecuniary interest.

Secondly, we question whether the aforesaid approach requiring the defendant to establish actual prejudice resulting from counsel's conflict of interest is a viable one in view of the Court of Appeals notation in *People v McDonald* (68 NY2d 1, 11, n 5, *supra)* indicating that the defendant in concurrent representation cases need not make such a showing. As heretofore discussed, the *McDonald* court stated: "[o]ur rejection of such a per se rule does not mean that defendant must specifically demonstrate prejudice, however, in order to obtain a reversal. It will be sufficient, absent the required inquiry and consent, that a substantial possibility of prejudice existed" *(People v McDonald, supra,* at 11, n 5).

In any event, we conclude that in this case, as a matter of law, the defendant was denied his constitutional right to counsel. As the United States Supreme Court warned in *Glasser v United States* (315 US 60, 76, *supra):* "[t]he right to have assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial". Moreover, as the Court of Appeals has held in *People v Donovan* (13 NY2d 148, 153-154): "[i]t cannot be overemphasized that our legal system is concerned as much with the integrity of the judicial process as with the issue of guilt or innocence. The constitutional and statutory safeguards provided for one accused of crime are to be applied in all cases. *The worst criminal, the most culpable individual, is as much entitled to the benefit of a rule of law as the most blameless member of society. To disregard violation of the rule because there is proof in the record to persuade us of a defendant's guilt would but lead to erosion of the rule and endanger the rights of even those who are innocent"* (emphasis added). Accordingly, the defendant's CPL 440.10

motion should be granted, the judgment of conviction vacated, and a new trial ordered.

In conclusion, we reiterate that the use of contingency fee contracts in criminal cases is strongly condemned by this court in view of their unethical nature (see, Code of Professional Responsibility DR 2-106 [C]) as well as the damaging effect such contracts have upon an accused's constitutional right to the effective assistance of counsel. In cases in which agreements of this type are found to exist, the Grievance Committee shall be immediately advised of the ethical violation and the matter referred to the Committee for its consideration and appropriate disciplinary action against counsel.

We have reviewed the defendant's remaining contentions and have found them to be without merit.

THOMPSON, RUBIN and KUNZEMAN, JJ., concur.

Ordered that the order is reversed, on the law, the motion is granted, the judgment is vacated and a new trial is ordered; and it is further,

Ordered that the appeal from the judgment is dismissed as academic in light of the determination on the appeal from the order.