THE BRICKMAN GROUP, LTD., Appellant

v.

CGU INSURANCE COMPANY

v.

Arthur J. Gallagher & Co. of Pennsylvania, Inc., William P. Curtis and Cathy L. James.

Superior Court of Pennsylvania.

Submitted Sept. 15, 2004.

Filed Dec. 29, 2004.

John N. Ellison, Philadelphia, for appellant.

Richard P. Limburg, Philadelphia, for CGU.

Jeffrey C. Sotland, Philadelphia, for Gallagher & Co.

Before: FORD ELLIOTT, MONTEMURO *, and JOHNSON, JJ.

JOHNSON, J.

¶ 1 In this case, we are called upon to review the trial court's grant of summary judgment to CGU Insurance Company (CGU, the insurer) and its concomitant dismissal of the suit brought by the Brickman Group Limited (Brickman, the insured). The action turns on Brickman's contention that CGU, by way of an oral and/or written agreement made outside the scope of the various insurance policies issued Brickman by CGU, promised to freeze rates for six years, and that when CGU attempted to raise premiums or "nonrenew" policies subject to that agreement during this six-year period it breached that agreement. The trial court granted summary judgment in CGU's favor primarily on the basis that such an agreement, where not memorialized in the policy documentation itself, is impermissible under Pennsylvania law and thus unenforceable. We affirm.

¶ 2 The trial court introduced this case as follows:

This dispute arises over Defendant CGU's alleged failure to abide by a purported agreement to sell a full program of various types of liability insurance to Plaintiff Brickman under the same terms and conditions, including premium rates, for a six year period between July 1, 1997 and July 1, 2003. According to the complaint, the purported agreement, containing both oral and written promises, which supposedly spanned six years, is referred to as the "Insurance Program Guarantee."

Certain material facts are undisputed. First and foremost, the parties do not dispute that the insurance policies sold to Brickman do not contain any of the terms of the Insurance Program Guarantee. It is also undisputed that the insurance policies are annual policies, each having a term of twelve months from July 1st of one year to July 1st of the next year. Further, it is undisputed that the insurance policies cover risks within the Commonwealth of Pennsylvania. These same insurance policies contain both state-mandated and customized notice provisions, relating to "non-renewal notification" and "renewal premium quotation commitment."

In addition, Brickman did not pay additional monies for the purported Insur-

* Retired Justice assigned to Superior Court.

ance Program Guarantee, beyond the premiums paid for the insurance policies. Rather, Brickman relied upon the Insurance Program Guarantee in moving its business from Royal Insurance Company ("Royal") to CGU in 1997. And in the years that followed, Brickman remained with CGU instead of moving its insurance business in reliance on the Insurance Program Guarantee.

Trial Court Opinion (T.C.O.), 3/26/02, at 1–3 (citations omitted). (Although the order that finalized the trial court's prior orders and ripened this case for review was issued on March 1, 2004, the rulings Brickman challenges were issued on March 26, 2002 (summary judgment) and August 3, 2001 (denying leave to amend). The trial court has never indicated any departure from the reasoning set forth in support of these orders. T.C.O., 4/13/04, at 2 (directing our attention to the opinion of March 26, 2002, for purposes of review). Thus, it is in light of the reasoning reflected in these opinions that we evaluate Brickman's claims. The various opinions to which we refer hereinafter will be identified by date.)

¶ 3 Brickman brought suit against CGU in July 2000. CGU filed preliminary objections, and in August Brickman filed its First Amended Complaint, which included counts alleging breach of contract, breach of fiduciary duty, and bad faith insurance practices under 42 Pa.C.S § 8371, and which sought equitable relief and damages. CGU filed preliminary objections to Brickman's First Amended Complaint, including a demurrer to each count alleged. On January 8, 2001, the trial court sustained CGU's demurrers to the counts alleging breach of fiduciary duty and statutory bad faith, and dismissed and struck those counts without prejudice. The trial court denied CGU's preliminary objections to the counts alleging breach of contract.

¶ 4 On May 11, 2001, Brickman filed a Motion for Leave to Amend Its First Amended Complaint. It sought to add new factual material and to reassert a § 8371 bad faith claim. It also sought, for the first time, to add a count alleging fraud based on newly discovered evidence. The trial court gave Brickman leave to file another amended complaint for purposes of expanding its account of the facts, but denied its request to add claims for bad faith and fraud. The parties filed cross-motions for summary judgment, which the trial court denied on October 8, 2001, finding that genuine issues of material fact precluded it from granting summary judgment.

¶ 5 On November 28, 2001, the court granted CGU leave to amend its Answer, New Matter, and Counterclaim to include a defense based on 40 P.S. § 471 (concerning premium rebates issued by insurance companies). Subsequently, CGU filed a motion seeking reconsideration of the trial court's previous denial of summary judgment. The trial court granted reconsideration and entered summary judgment on the breach of contract counts raised by Brickman, thus removing Brickman's remaining basis for relief. The court ruled that the Insurance Program Guarantee freezing Brickman's insurance rates constituted an impermissible inducement or special advantage under 40 P.S. §§ 275 and 471, and thus was void *ab initio* and unenforceable.

¶ 6 Thereafter, Brickman moved for reconsideration both of the trial court's grant of summary judgment and of the trial court's refusal to permit Brickman to amend its complaint to allege counts of bad faith and fraud. The trial court denied Brickman's motion. Next, Brickman filed an application for determination of finality, which the trial court granted. Brickman then sought review in this Court, which we

denied for want of jurisdiction because we found no final appealable order. The parties then negotiated a dismissal of all claims involving third-party defendants, and the trial court ordered the discontinuance of the joinder complaint. That action made the trial court's judgment final and ripened this case for review.

¶ 7 Brickman appeals, raising the following questions for our review:

1. Whether the trial court erred first in allowing CGU to amend its Answer to allege as a "defense" that CGU acted illegally in using the Insurance Program Guarantee as an inducement to insurance without attaching it to the insurance policies, without giving Brickman the opportunity for discovery on that defense, and then in granting summary judgment and dismissing Brickman's claims?

2. Whether the trial court erred in denying Brickman's Motion for Leave to Amend to add a count for fraud?

3. Whether the trial court erred in dismissing Brickman's bad faith claim under 42 Pa. Cons.Stat. Ann. § 8371 and in denying Brickman leave to amend its allegations of bad faith.

Brief for Appellant at 10.

¶ 8 With its first question, Brickman argues that in finding the Insurance Program Guarantee illegal and accordingly granting summary judgment to CGU, the trial court in effect vindicated CGU's illegal conduct. In the summary of its argument, Brickman says,

[t]he trial court erroneously felt compelled by the law, not by justice, to allow CGU to escape its responsibilities, stating that while it did not "condone the making of illegal contracts by insurers to avoid liability to their insureds," the court "cannot enforce the Insurance Program Guarantee and must grant summary judgment in favor of CGU . . . ."

Brief for Appellant at 20 (quoting T.C.O., 3/26/02, at 8). Indeed, Brickman refers incessantly to CGU's putative "illegal conduct" throughout the twenty pages of its argument on its first question, Brief for Appellant at 22–43, relying, it would seem, solely on the trial court's reference to the "making of illegal contracts." We must note at the outset, however, that the trial court referred to that action expressly in regard to insurers' efforts "to avoid liability to their insureds." While CGU has attempted to "nonrenew" policies it issued to Brickman, we fail to see how this constitutes an effort to avoid liability rather than an effort to end or modify CGU's contractual relationship with Brickman. As CGU notes, "Brickman still does not allege any denial of benefits for covered claims and still does not allege any mishandling of existing insurance claims under an existing policy." Brief for Appellee at 37. Accordingly, we agree with CGU that "the allegedly intentional failure to attach" the Insurance Program Guarantee to the policy, the evident core of Brickman's allegations of "illegal conduct," is a "red herring." Brief for Appellee at 43 n. 25.

¶ 9 Our scope and standard of review are well established.

Our scope of review of a trial court's grant of summary judgment is plenary. Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions and affidavits and other materials demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. We apply the same standard of review as the trial court in that we view the record in the light most favorable to the party opposing the motion and resolve all doubts as to the existence of a genuine issue of material

fact in favor of the nonmoving party. * * * * We will reverse the trial court's grant of summary judgment only upon an abuse of discretion or error of law. *Flannery v. Stump*, 786 A.2d 255, 257 (Pa.Super.2001) (internal citations omitted).

¶ 10 The trial court granted CGU summary judgment based on its reading of 40 P.S. §§ 275 and 471. Section 275 provides:

**§ 275. Rebates and inducements prohibited**

(a) No insurance agent, solicitor or broker … shall offer, promise, allow, give, set off, or pay, directly or indirectly, any rebate of, or part of, the premium payable on the policy or on any policy or agent's commission thereon, or earnings, profit, dividends, or other benefit founded, arising, accruing or to accrue thereon or therefrom, or any special advantage in date of policy or age of issue, or any paid employment or contract for services of any kind, or any other valuable consideration or inducement, to or for insurance on any risk in this Commonwealth, now or hereafter to be written, which is not specified in the policy contract of insurance ….

40 P.S. § 275; *cf.* 40 P.S. §§ 310.45, 310.46 (successor statute enacted by P.L. 1183, No. 147, §§ 1–2 (December 3, 2002) (effective in 180 days)). Section 471 proscribes in materially identical terms the same conduct where effected by an "insurance company, association, or exchange." 40 P.S. § 471. Our Supreme Court has held that "the object of this legislation is to outlaw unfair treatment of prospective insurants of the same class by offering inducements to one person that are not available to all persons of the same class." *McDowell v. Good Chevrolet–Cadillac*, 397 Pa. 237, 154 A.2d 497, 500 (1959) (internal quotation marks omitted). Moreover,

"[t]he thrust of the anti-rebate provisions of the statute is against the placement of insurance whereby the insured secures the insurance at a favored rate, regardless of the mode [or] the manner in which such favored rate is obtained." *Id.* Thus, "a reduction of cost is the test of whether or not the statute is being violated." *Id.* (internal quotation marks omitted). After reviewing applicable caselaw, the trial court noted the absence of dispute that the putative Insurance Program Guarantee was not "incorporated or endorsed within the insurance policies," ruled that the Insurance Program Guarantee might be "deemed illegal under either 40 P.S. § 275 or 40 P.S. § 471," and thus declined to enforce it. T.C.O., 3/26/02, at 8.

¶ 11 In response to this ruling, Brickman raises numerous arguments, which we address *seriatim.* First, Brickman challenges the trial court's finding that CGU in fact offered any inducement of the kind envisaged under §§ 275 and 471. Given the breadth of the definition of the rate reductions proscribed to encompass, effectively, any reduction of cost, *see McDowell*, 154 A.2d at 500, we find this argument wholly without merit. In deposition testimony, Brickman's Vice President and General Counsel, Mark Hjelle, testified that it could cost Brickman up to $1 million per year more than under the rates purportedly frozen by the CGU Insurance Program Guarantee to secure in the open market the same suite of insurance policies issued to Brickman by CGU. Defendant CGU Insurance Company's Motion for Summary Judgment, 7/2/01, Exh. 59, R. at 1368–69; Second Amended Complaint, 8/30/01, at 9, ¶ 44, R. at 465a (noting that when CGU declined to honor the Insurance Program Guarantee, "Brickman accepted the proposal of Atlantic Mutual Insurance Company, which was for terms and rates that were less favorable to Brickman than

those guaranteed by CGU in its Insurance Program Guarantee"). Brickman cannot credibly assert at once its entitlement to such damages while maintaining that CGU has failed to show any rate reduction arising from the Insurance Program Guarantee.

¶ 12 We also find unpersuasive Brickman's contention that, since the premiums it paid were in fact those listed on the insurance contract, no violation of the non-rebate laws occurred. Brief for Appellant at 26–28. It is undisputed that the policies were described in their documentation as one-year policies. According to Brickman, however, the Insurance Program Guarantee in fact made them six-year policies. The absence of this commitment from the policy documentation itself, however, "could stymie regulatory review," Brief for Appellant at 26, notwithstanding Brickman's contentions to the contrary. From the policy documentation itself no regulator would know that Brickman enjoyed the benefits of a six-year commitment not to vary the rates on the policy. Thus, this aspect of the policies before us puts them squarely in the territory proscribed by §§ 275 and 471, and the trial court did not err in so ruling.

■ ¶ 13 Next, Brickman attacks the trial court's ruling on grounds that even if the contract was properly found to be illegal, equity warrants (and caselaw permits) enforcement of the contract against the more blameworthy party—in this case CGU, according to Brickman. Brief for Appellant at 30–42. We grant *arguendo* Brickman's premise that, under appropriate circumstances, courts may enforce contracts found to be illegal. Brief for Appellant at 35–42 (citing, *inter alia, City of Philadelphia v. Rosin's Parking Lots*, 358 Pa. 174, 56 A.2d 207, 209 (1948)). Even so, two aspects of Brickman's argument fail to persuade us that this case presents circumstances calling for enforcement of the contract the trial court properly found to be illegal.

■ ¶ 14 First, Brickman contends that because it lacked the technical sophistication to recognize the import of CGU's failure to endorse to the policies the Insurance Program Guarantee, while CGU is legally assumed to possess such knowledge, Brickman is not *in pari delicto* with CGU—that is, Brickman is less culpable than CGU with regard to any illegalities marring the insurance contract or surrounding conduct. *See Peyton v. Margiotti*, 398 Pa. 86, 156 A.2d 865, 868 (1959). Accordingly, Brickman argues, the Insurance Program Guarantee should be enforced against CGU notwithstanding its illegality. To this end, Brickman contends that it "entered into and fully performed its part of the agreement with no intention or knowledge of any illegality." Brief for Appellant at 34. "Unlike CGU . . ., Brickman is untrained in insurance matters and does not know what needs to be, and need not be, attached to an insurance policy." Brief for Appellant at 35.

¶ 15 In *Peyton*, our Supreme Court held: "When the parties to a contract against public policy or otherwise illegal are not in pari delicto, or equally guilty, and when public policy is considered as advanced by allowing either, or at least the more excusable of the two, to sue, relief may be granted." 156 A.2d at 868. We are persuaded, however, that in the instant case the parties were *equally* responsible for the illegality of the Insurance Program Guarantee. Throughout the transactions underlying this action, Brickman was represented by brokers which Brickman admits were found to have participated in the formation of a contract violative of 40 P.S. § 275. Brief for Appellant at 35. There is no dispute that brokers Bill Curtis and Cathy James represented Brickman

throughout its dealings with CGU—first in the employ of Arthur J. Gallagher & Co. of Pennsylvania, Inc., and then as Porter & Curtis LLC. Letter from Porter & Curtis LLC to Russell Harding, Account Executive, CGU, 6/9/99, at 1–2, R. at 751a–52a; Notice of Nonrenewal of Insurance, 3/16/01, R. at 1310a (identifying Porter & Curtis LLC as "Producer" for Brickman). Indeed, as CGU notes, insofar as the contract Brickman would have us uphold is the Insurance Program Guarantee rather than the policies themselves, Brickman is in fact the *proponent* of the illegal contract, Brief for Appellee at 24, notwithstanding any dispute as to who was its "architect." Reply Brief for Appellant at 13.

■ ¶ 16 According to Pennsylvania's administrative code, "[w]hen a broker is authorized by the client to secure insurance, the broker shall be considered the legal agent of the client." 31 Pa.Code § 37.45(b); *see Taylor v. Liverpool & London & Globe Ins. Co.*, 68 Pa.Super. 302, 1917 WL 3486, *2 (Pa.Super. July 13, 1917); *Kearns v. Minn. Mut. Life Ins., Co.*, 75 F.Supp.2d 413, 422 (E.D.Pa.1999); *Talley v. Hoffman*, 18 Pa. D. & C.2d 725, 727–28 (Lycoming County 1959). As such, the broker's knowledge is imputed to the principal—in this case the insured, Brickman. *See Kearns*, 75 F.Supp.2d at 422; *Rich Maid Kitchens, Inc., v. Pa. Lumbermens Mut. Ins. Co.*, 641 F.Supp. 297, 309 (E.D.Pa.1986); *McCormick v. Shuman*, 15 Pa. D. & C.2d 660, 661 (Columbia County 1958). In Pennsylvania, insurance brokers are subject to rigorous licensure criteria. *See* 40 P.S. § 310.6; *McCormick*, 15 Pa. D. & C.2d at 661. Brickman cites no authority suggesting that the knowledge required for a brokerage license—which here is imputed to Brickman as principal—differs materially from that Brickman would have us impute to CGU. Nor are we swayed

from this view by Brickman's argument that Gallagher had a brokerage relationship with CGU. Reply Brief for Appellant at 8–11. The Pennsylvania Code, at 31 Pa.Code § 37.45(b), incorporates no exception for such a case. Indeed, William Curtis acknowledged that, when seeking the best terms from an insurer on Brickman's behalf, "it would be fair to say that [he was] acting as Brickman's broker." Deposition of William P. Curtis, Jr., 4/12/01, at 145, R. at 1528b. Accordingly, we find that Brickman and CGU were *in pari delicto* to any illegality found in the Insurance Program Guarantee. Thus, we find no basis under these principles to rule that enforcement of an illegal contract is appropriate in this context.

¶ 17 We note as well that Brickman's claim of ignorance of the law is unequivocally defied by the record. Far from suggesting a blind reliance on the Insurance Program Guarantee, the conduct of record demonstrates that Brickman, its insurance brokers, and its risk management consultant, *see* Deposition of Cathy James, 2/28/01, at 24, R. at 633a (identifying Brickman's risk management consultant as responsible for specifying criteria for insurance bids), behaved in full knowledge of the premium increase, nonrenewal, and cancellation provisions explicitly stated on the face of the policies. *See, e.g.,* Defendant CGU Insurance Company's Motion for Summary Judgment, Exhibit 10, 1997–1998 Business Auto Policy Excerpts, Pennsylvania Changes—Cancellation and Nonrenewal, R. at 961a–62a (providing notice requirements for "Cancellation," "Nonrenewal," and "Increase of Premium"), and companion provisions for other 1997–98 polices, R. at 983a–84a, 998a–99a, 1012a, 1035a–36a; comparable provisions for 1998–99 policies, R. at 1058a–59a, 1073a–74a; 1999–2000 policies, R. at 1093a, 1113a–14a, 1136–37a, 1152a–53a; and 2000–01 policies, R. at 1171a, 1187a–88a,

R. at 1206a–07a, 1217a–18a. Indeed, several policies in question featured custom language substantially *adding* to the statutory minimum notice requirements. *See, e.g.,* Special Provisions Endorsement, effective 7/1/97, R. at 936a–37a (extending Nonrenewal Notification Provision beyond statutory requirements); *see also* R. at 1169a–70a, 1184a–86a, 1203a–04a (all substantially the same). Thus, the notice provisions were not overlooked as boilerplate; rather, they were tailored by Brickman through its broker to satisfy highly specific notice demands exceeding those required by statute. In light of this fact, we must infer that Brickman, through its agents or employees, had legal knowledge of the inherent contradiction between these provisions and the putative agreement memorialized in the Insurance Program Guarantee.

¶ 18 Brickman's argument from "public policy," Brief for Appellant at 37–39, is even less convincing. Again, if we grant *arguendo* that the principle set forth in Restatement (Second) Contracts § 179, cmt. C, that we may enforce an illegal contract where failure to do so frustrates public policy, applies generally, we do not agree with Brickman that a failure to rule in its favor would lead to a fusillade of inappropriate conduct by insurance companies. Brickman continually confuses CGU's alleged failure to honor the Insurance Program Guarantee, a document at best collateral to the policies in question, with a failure to honor commitments made under the policies themselves. If our decision in favor of CGU in this case has the effect of encouraging insurance brokers, who are expected to know the law, to require insurers to endorse to covered policies any multi-year rate guarantees, this will militate toward satisfaction of the legislative intent to increase regulatory transparency and consumer protection manifest in 40 P.S. §§ 275, 471. *See Blouch v. Clif-*

*ford R. Zinn & Son, Inc.,* 350 Pa.Super. 327, 504 A.2d 862, 864 (1986) ("The object of this legislation is to outlaw unfair treatment of prospective insurance clients of the same class."); *McDowell,* 154 A.2d at 500 (same). We cannot construe this result as one disserving public policy. We also fail to see how Brickman's parade of horribles—insurance companies deliberately forging illegal policy documentation in order to avoid honoring their insurance commitments later—follows from our ruling here. Accordingly, this argument warrants no further consideration. We find that the trial court did not err in granting summary judgment in favor of CGU.

¶ 19 This does not end our review. Brickman's second question challenges the trial court's denial of its petition seeking leave to amend its First Amended Complaint to add a count asserting fraud against CGU. Brief for Appellant at 44–52. The question also asserts a challenge to the trial court's denial of leave to add a count asserting statutory bad faith, which the trial court had rejected once previously, T.C.O., 1/8/01, at 16–21. Under Pennsylvania law, all bad faith claims derive from statute. *See Terletsky v. Prudential Prop. & Cas. Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680, 688 (1994) (noting "no common law remedy in Pennsylvania for bad faith on the part of insurers"). Thus, we consider Brickman's bad faith challenge in the discussion of its third question, *infra,* which directly addresses the ruling in light of the relevant statute, 42 Pa.C.S. § 8371. In the immediately ensuing discussion, we restrict ourselves to the trial court's ruling denying Brickman leave to amend its complaint to include a count for fraud.

¶ 20 Our standard of review of a trial court's order denying a plaintiff leave to amend its complaint, which governs our consideration of Brickman's second and

third questions, permits us to overturn the order only if the trial court erred as a matter of law or abused its discretion. *See Glover v. SEPTA*, 794 A.2d 410, 413 n. 4 (Pa.Cmwlth.2002). The trial court enjoys "broad discretion" to grant or deny a petition to amend. *See Horowitz v. Univ. Underwriters Ins. Co.*, 397 Pa.Super. 473, 580 A.2d 395, 398 (1990). Amendment of pleadings is governed by Pa.R.C.P. 1033, which provides: "A party, either by filed consent of the adverse party or by leave of court, may at any time change the form of action, correct the name of a party or amend his pleading." Although the trial court generally should exercise its discretion to permit amendment, *see Pilotti v. Mobil Oil Corp.*, 388 Pa.Super. 514, 565 A.2d 1227, 1229 (1989); *cf.* Pa.R.C.P. 126 (encouraging liberal construal of the civil rules), where a party will be unable to state a claim on which relief could be granted, leave to amend should be denied. *See Stouffer v. Commonwealth, Dep't of Transp.*, 127 Pa.Cmwlth. 610, 562 A.2d 922, 923 (1989).

▌ ¶ 21 The trial court ruled that Brickman's fraud claim was barred by the "gist of the action" doctrine, which precludes the bringing of tort claims that are collateral to claims sounding in breach of contract. *See eToll, Inc., v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa.Super.2002). The trial court ruled that Brickman's fraud claim was based on the asserted breach of the Insurance Program Guarantee, and that it was therefore encompassed in, rather than collateral to, the action seeking relief for breach of that agreement. T.C.O., 8/3/01, at 11.

> The gist of the action doctrine is designed to maintain the conceptual distinction between breach of contract claims and tort claims. As a practical matter, the doctrine precludes plaintiffs from re-casting ordinary breach of con-

tract claims into tort claims. The *Bash* Court explained the difference between contract claims and tort claims as follows:

> [a]lthough they derive from a common origin, distinct differences between civil actions for tort and contract breach have developed at common law. Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals .... To permit a promisee to sue his promisor in tort for breaches of contract inter se would erode the usual rules of contractual recovery and inject confusion into our well-settled forms of actions. [*Bash v. Bell Tel. Co.*, 411 Pa.Super. 347, 601 A.2d 825, 829 (Pa.Super.1992).]

Thus, although mere non-performance of a contract does not constitute a fraud, it is possible that a breach of contract gives rise to an actionable tort. To be construed as in tort, however, the wrong ascribed to defendant must be the gist of the action, the contract being collateral. The important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus. In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts and not by the larger social policies embodied by the law of torts.

The question of whether the gist of the action doctrine applies is an issue of law subject to plenary review.... The test is not limited to discrete instances of conduct; rather the test is, by its own terms, concerned with the nature of the action as a whole.

*eToll,* 811 A.2d at 14–15. In *eToll,* the first and only Pennsylvania appellate case to present the question, we determined that "until our Supreme Court holds otherwise, the gist of the action doctrine should apply to claims for fraud in the performance of a contract." *Id.* at 20.

¶ 22 Brickman contends that the essence of its allegations of fraud arises not from the Insurance Program Guarantee itself, but rather from the circumstances surrounding its execution. Alternatively, Brickman argues that when the Insurance Program Guarantee was ruled unenforceable, the fraud claim lived on precisely due to CGU's putative admission of improper conduct. This second argument is adequately addressed in our rejection, *supra,* of Brickman's serial unsupported references to CGU's "illegal conduct." · The first argument, however, warrants discussion.

¶ 23 The trial court, after reciting the above stated principles of the gist of the action doctrine, acknowledged that "courts have generally not applied the [gist of the action] doctrine where the defendant not only breached the contract, but also made misrepresentations about the breach in order to deceive the unsuspecting plaintiff into continuing the contractual relationship or to not assert its contractual rights against the defendant." T.C.O., 8/3/01, at 10 (citing a common pleas court decision that cited four federal district court decisions). The trial court concluded that

> [a]ll of Brickman's allegations in its proposed count for fraud are dependant upon its breach of contract claim for CGU's alleged failure to perform under the Insurance Program Guarantee. Brickman is seeking to enforce its purported right to be sold insurance policies by CGU at the same guaranteed rates over a five- and six-year period, which is

a right that derives directly from the alleged Insurance Program Guarantee. T.C.O., 8/3/02, at 11.

¶ 24 As Brickman argues, the law appears to permit fraud in the inducement claims in disputes involving contractual obligations, notwithstanding that the gist of the action doctrine would bar claims of fraudulent (non)performance. Brief for Appellant at 45 (citing *BDGP, Inc., v. Ind. Mortgage Co.,* 2004 WL 960013, *3 (Pa. Com.Pl. March 31, 2004)). This conclusion logically follows the principles this Court set forth in *eToll,* where we held that "the important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." 811 A.2d at 14; *see id.* at 19 ("[T]he cases seem to turn on the question of whether the fraud concerned the performance of contractual duties. If so, then the alleged fraud is generally held to be merely collateral to a contract claim for breach of those duties. If not, then the gist of the action would be the fraud, rather than any contractual relationship between the parties."). Accordingly, in such situations, the "gist of the action" is principally a matter of the law of torts, and the trial court erred to the extent it suggested otherwise. T.C.O., 8/3/02, at 11 ("At best, Brickman's allegations set forth a fraudulent inducement claim to enter into the Insurance Program Guarantee, but such a claim is barred by the 'gist of the action' doctrine.").

¶ 25 Our ruling on this narrow point, however, neither ends our inquiry nor compels a ruling in Brickman's favor. We are not bound by the trial court's rationale, and may affirm its ruling on any basis. *See Blumenstock v. Gibson,* 811 A.2d 1029, 1033 (Pa.Super.2002). If we find that Brickman failed in any way to state a

fraud claim on which relief could be granted, we must conclude that the trial court's refusal to grant Brickman leave to amend its complaint was proper. *See Stouffer*, 562 A.2d at 923.

¶ 26 "The essential elements of a cause of action for fraud or deceit are a misrepresentation, a fraudulent utterance thereof, an intention to induce action thereby, justifiable reliance thereon and damage as a proximal result." *Wilson v. Donegal Mut. Ins. Co.*, 410 Pa.Super. 31, 598 A.2d 1310, 1315 (1991). As we have noted *supra*, Brickman was at all times represented by certified insurance brokers putatively protecting Brickman's interest. It is beyond dispute that the documents embodying the policies in question plainly specified only one-year terms of coverage. Furthermore, those same policy documents provided clauses concerning notice of premium increases as well as CGU's right to "nonrenew" or cancel the policies. Moreover, these provisions were tailored by CGU's agents to provide greater protection than required by statute. In light of these negotiations, the plain inconsistency on the face of the policies with the putative Insurance Program Guarantee, and the fact that at all times Brickman was, as a matter of law, responsible for knowing the law as its certified broker, the trial court properly could have determined in its discretion that the misrepresentation or fraudulent utterance necessary to sustain a fraud charge could not be proved at trial. Accordingly, we find that the trial court neither erred as a matter of law nor abused its discretion in declining to permit Brickman to amend its complaint to include a legally insupportable fraud claim and affirm this aspect of its ruling.

¶ 27 This brings us, finally, to Brickman's third question, which challenges the trial court's dismissal of Brickman's count alleging statutory bad faith under 42 Pa.

C.S. § 8371 and its subsequent refusal to permit Brickman to restore a § 8371 claim to its second amended complaint. When first faced with this issue, in responding to CGU's preliminary objections, the trial court found that "bad faith" for purposes of § 8371 referred only to an insurance company's improper denial of, or refusal to pay on, claims covered by the policy in question. T.C.O., 1/8/01, at 19. In support of this finding, the trial court relied on this Court's affirmative statements of law, T.C.O., 1/8/01, at 19 (citing *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1036 (Pa.Super.1999)), as well as federal cases reaching the same result, in which "the courts refused to hold the insurance companies liable under § 8371 for an alleged bad faith failure to renew the insured's policies." T.C.O., 1/8/01, at 19. In revisiting its earlier ruling in response to Brickman's Motion for Leave to Amend the Complaint, the court rejected Brickman's "revamped" effort to seek relief under § 8371 on a theory of "anticipatory breach," under which Brickman claimed that CGU's refusal to renew the policies at the rates supposedly guaranteed by the Insurance Program Guarantee in effect constituted a breach of the policies and thus brought the case under the ambit of § 8371. T.C.O., 8/3/01, at 6–7.

¶ 28 Section 8371 provides as follows:

**§ 8371.   Actions on insurance policies**

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S. § 8371. This Court has held that "the Pennsylvania legislature intended [§ 8371] to protect an insured from bad faith denials of coverage." *Gen. Acc. Ins. Co. v. Fed. Kemper Ins. Co.*, 452 Pa.Super. 581, 682 A.2d 819, 822 (1996). This Court also has held, however, that

> when evaluating the conduct of an insurer under section 8731, the trial court "may look to (1) other cases construing the statute and the law of 'bad faith' generally; (2) the plain meaning of the term(s) used in the statute; and/or (3) other statutes upon the same or similar subjects ...." Specifically, our Court noted that conduct which constitutes a violation of the UIPA may also be considered when determining whether an insurer acted in bad faith under the statute. *See* 40 P.S. § 1171.5 (UIPA—Unfair methods of competition and unfair or deceptive acts or practices defined).

*O'Donnell v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.1999) (quoting *Romano v. N'wide Mut. Fire Ins. Co.*, 435 Pa.Super. 545, 646 A.2d 1228 (1994)) (some citations omitted). In that case, our narrow holding brought within the ambit of § 8371 the insurer's litigation conduct following the assertion of a claim under the relevant policy. Since *O'Donnell*, on which Brickman principally relies, this Court repeatedly has held, however, that "[t]he elements of the statutory cause of action for bad faith are: (1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis." *Booze v. Allstate Ins. Co.*, 750 A.2d 877, 880 (Pa.Super.2000). Moreover, these elements must be demonstrated by clear and convincing evidence. *See Adamski*, 738 A.2d at 1036. Neither *O'Donnell* nor any other case interpreting § 8371 extends that section's protection to conduct preceding the execution of insurance coverage.

¶ 29 Brickman maintains, however, that the allegations it sought to add to its second amended complaint set forth the basis for a bad faith claim.

> Brickman sought to allege that CGU committed bad faith [*sic*] by asserting, without reasonable basis, provisions in the Liability Insurance Policies it sold to Brickman which require CGU to provide specified notice prior to non-renewal, cancellation, or premium increases, as a justification for its decision to non-renew and/or increase premiums in violation of its Insurance Program Guarantee. Brickman further sought to allege that CGU's assertion of the Notice Provisions to avoid its responsibilities was a reckless and/or intentional effort to avoid paying claims under the Liability Insurance Policies that CGU promised to sell for the 2001–02 and 2002–03 policy periods at guaranteed rates. These allegations conformed the complaint to the facts learned in discovery and brought Brickman's statutory bad faith claim within the narrow bad faith standard articulated by the trial court.

Brief for Appellant at 56. This contention reduces to two propositions: 1) that CGU's reliance on the clear provisions regarding premium increases, policy nonrenewal, and policy cancellation that appeared in the policy documents, in favor of the Insurance Program Guarantee was improper; and 2) that said reliance created an actionable claim for "anticipatory breach." We already have rejected the first contention in prior discussion by reference to the fact that Brickman was represented by a broker, that everything in question was clear on the face of the policy documentation, and that these facts belie any claim of fraudulent conduct on the part of CGU.

¶30 Brickman's second contention, we note, wants for supporting authority. Brickman has failed to demonstrate that a claim for anticipatory breach even exists in this context, and it has provided no clear reason for us to recognize such a cause of action in the instant case. Accordingly, we find neither legal error nor abuse of discretion in the trial court's ruling that Brickman failed to show that it should be allowed to allege a violation of § 8371.

¶31 For all the foregoing reasons, we affirm the trial court's orders granting CGU summary judgment and denying Brickman leave to amend its complaint.

¶32 Orders **AFFIRMED**.