Jacqueline Nieves CRUZ and
Oscar Cruz, Appellants

v.

PRINCETON INSURANCE COMPA-
NY, Alan S. Gold, Esquire and Gold,
Butkovitz & Robins, P.C., Appellees.

Superior Court of Pennsylvania.

Argued Oct. 26, 2006.
Filed March 24, 2009.

Anne E. Pedersen, Philadelphia, for appellants.

Jeffrey B. McCarron, Philadelphia, for Gold, appellees.

Jonathan Bart, Philadelphia, for Princeton, appellee.

BEFORE: FORD ELLIOTT, P.J., STEVENS, MUSMANNO, ORIE MELVIN, LALLY–GREEN, TODD *, BENDER, BOWES, and PANELLA, JJ.

OPINION BY BENDER, J.:

¶ 1 This matter comes before us on remand from the Supreme Court of Pennsylvania for consideration of whether plaintiffs Jacqueline Nieves Cruz and Oscar Cruz (the Cruzes) adduced evidence sufficient to raise a question of material fact concerning the harm element of their claim for Abuse of Process. The Cruzes argue, and we conclude, that the evidence, both direct and circumstantial, does raise such a question. Accordingly, we reverse the order granting summary judgment and remand this matter to the trial court for further proceedings on the Cruzes' action.

¶ 2 The Cruzes commenced this action for abuse of process [1] following Princeton Insurance Company's filing of a petition for appointment of a guardian *ad litem* that sought to supersede the Cruzes' authority as parents to negotiate a post-trial settlement offer that Princeton made on behalf of its insured, Northeastern Hospital. Defendants Alan S. Gold and Gold, Butkovitz & Robins, P.C., represented Princeton in that process.

¶ 3 In the underlying litigation, reviewed by this Court in *Cruz v. Northeastern Hosp.*, 801 A.2d 602 (Pa.Super.2002), the Cruzes secured a $15,000,000 judgment in favor of their son, Adam Omar Cruz, for injuries he sustained during birth. During our review of this case prior to remand we related the history of the *Cruz* case as it relates to the litigation now before us. We repeat that history here:

> In 1994, Appellants, individually and on behalf of their son, Adam, filed a medical malpractice action against Northeastern Hospital, Dr. Myung Hyo Shin, and Dr. Robert Cogan, seeking damages for permanent and debilitating injuries Adam sustained when he was born on August 14, 1992. Appellants dropped their individual claims and, in August 2000, a jury returned a verdict in favor of Adam and against the hospital in the amount of $10,811,431.27.[FN1] Following Appellants' motion for delay damages, the verdict was molded to over $15,000,000. The hospital and Appellants cross-appealed.

> FN1. The jury found in favor of the physician defendants.

> Princeton, the hospital's insurer, retained Attorney Gold of GBR to handle the appeal and related settlement negotiations. While the appeal was pending before this Court,[FN2] the parties began settlement negotiations before a mediator selected by Princeton. This media-

---

* Justice Todd did not participate in the consideration or decision of this case.

1. In *Werner v. Plater–Zyberk*, 799 A.2d 776, 785 (Pa.Super.2002), this Court defined abuse of process as follows:

   "Abuse of process" is defined as "the use of legal process against another primarily to accomplish a purpose for which it is not designed." *Shiner [v. Moriarty]*, 706 A.2d at 1236 (quoting *Rosen v. American Bank of Rolla*, 426 Pa.Super. 376, 627 A.2d 190, 192 (1993)).

   To establish a claim for abuse of process it must be shown that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff.
   *Id.* Abuse of process is, in essence, the use of legal process as a tactical weapon to coerce a desired result that is not the legitimate object of the process. *McGee v. Feege*, 517 Pa. 247, 259, 535 A.2d 1020, 1026 (1987). Thus, the gravamen of this tort is the perversion of legal process to benefit someone in achieving a purpose which is not an authorized goal of the procedure in question.

tor suggested a settlement in the range of $8 to $10 million. Settlement discussions continued through February 2002, but Appellants rejected Princeton's offer to settle the case for $7,000,000.

FN2. On April 17, 2002, this Court affirmed the judgment entered in favor of Appellants. *Cruz v. Northeastern Hospital,* 801 A.2d 602 (Pa.Super.2002).

On February 27, 2002, on behalf of his client, Attorney Gold petitioned the court to appoint a guardian *ad litem* for Adam. The petition alleged in pertinent part:

6. Princeton and the Cruzes have engaged in excessive settlement negotiations with the aid of Abraham Gafni, former judge of the Court of Common Pleas of Philadelphia County as a mediator. The parties have reached an impasse in those negotiations. Princeton Insurance Co. has offered $7,000,000 to the Cruzes. This constitutes sufficient money to support [Adam] for the rest of his life. This money has been turned down.

7. Princeton Insurance Co. believes that a substantial possibility exists that Northeastern Hospital will prevail on the appeal and that the Cruzes may receive no money for [Adam].

8. [Adam's] medical expenses would then become a burden on the taxpayers of this Commonwealth.

9. [Adam] would not have the opportunity to have the full services that he would if his parents accepted the $7,000,000.

10. Princeton Insurance Co. respectfully requests that this Court appoint a guardian *ad litem* to evaluate the settlement demand and to represent the interest of [Adam] in this litigation.

11. Princeton believes that the parents have had a substantial disagreement among themselves concerning how to handle this litigation and whether to accept the settlement offer of Princeton Insurance Co. made on behalf of Northeastern Hospital.

12. Further, a potential conflict of interest exists between plaintiffs' counsel and the interests of the minor client, [Adam], particularly in light of disagreement among his parents with respect to the settlement offer.

13. The appointment of a guardian ad litem will insure that the interest of the child will be protected. The guardian *ad litem* would pursue the litigation on behalf of [Adam] and evaluate settlement offers.

Petition for Appointment of Guardian Ad Litem For Adam Cruz[.] The trial court denied the petition on March 7, 2002, and, shortly thereafter, Appellants accepted in principle Princeton's settlement offer of $7,100,000. This offer was ultimately approved by the trial court on September 5, 2002.

On May 22, 2003, Appellants filed a complaint in the instant action for abuse of process against Appellees alleging that, by improperly filing the petition for appointment of a guardian *ad litem,* Appellees caused them "extreme emotional distress, fear, upset and anxiety that their parental rights could be terminated" and that they "became so fearful of subsequent assaults on their parental rights that they agreed to the settlement offer of $7,000,000 rather than to continue with negotiations." Complaint, 5/22/03, at 5. On this latter contention, Appellants have since dropped any damages claim that, as a result of the filing of the guardianship petition, they were

coerced into prematurely settling the case.[FN3]

FN3. At *en banc* oral argument in this matter, Appellants' counsel confirmed that Appellants were no longer seeking damages related to any coercion to settle the case.

Appellees filed separate motions for summary judgment, which the trial court granted in separate orders on October 18, 2004. Appellants' motion for reconsideration was denied, and this timely appeal followed.

*Cruz v. Princeton Ins. Co.*, 925 A.2d 853, 854–856 (Pa.Super.2007).

¶ 4 Following oral argument, a panel of this Court found that the trial court had erred in granting summary judgment, reasoning that the evidence adduced in discovery raised an issue of material fact concerning the extent to which Princeton and its counsel commenced the guardianship action for the improper purpose of forcing the Cruzes to settle the underlying malpractice litigation for less than the amount of the outstanding judgment. *See Cruz v. Princeton Ins. Co.*, 3191 EDA 2004, 3192 EDA 2004 (Pa.Super. March 14, 2006) (withdrawn). Subsequently, however, this Court granted reconsideration *en banc* and, following Reargument, a Majority of the *en banc* panel rejected the rationale of the original merits panel, concluding that the evidence did not raise a question of material fact concerning the propriety of Princeton's use of the guardianship action. Judge Orie Melvin filed a Concurring Opinion agreeing with the Majority's affirmance of the trial court's order, but suggesting that regardless of the propriety of Princeton's motives, the evidence failed to establish a question of material fact concerning whether the Cruzes had sustained emotional harm as a result of the filing of the guardianship action. *Id.* at 12 (Orie Melvin, J. concurring). Judge (now Justice) Todd dissented, reasoning that the evidence raised questions of material fact concerning both of the disputed elements of the abuse of process claim and asserted that, consequently, the trial court's order should be reversed and the case remanded for a trial on the issues. *Id.* at 17 (Todd, J. dissenting).

¶ 5 We rendered our decision on May 30, 2007, following which the Cruzes sought allowance of appeal to the Supreme Court of Pennsylvania. Upon review, the Supreme Court reversed our decision, *per curiam*, by way of the following order:

**AND NOW,** this 29th day of May 2008, the Petition for Allowance of Appeal is **GRANTED** and the Superior Court's decision is **REVERSED** in part to the extent it holds that there was no genuine issue of material fact regarding whether the use of the process was primarily used for a purpose for which it was not designed. *See Wimer v. Pa. Emp. Benefit Trust Fund,* [595 Pa. 627] 939 A.2d 843 (Pa.2007); *see also McNeil v. Jordan,* [586 Pa. 413] 894 A.2d 1260 (Pa.2006). Further, this matter is **REMANDED** to the Superior Court for consideration of the harm element of *McNeil,* 894 A.2d at 1275.

Madame Justice Todd did not participate in the consideration or decision of the matter.

Per Curiam Order, 5/29/08 at 1.

¶ 6 Although issued without Opinion, the Supreme Court's order clearly responds to our prior *en banc* Opinion, invalidating its conclusion and establishing the law of this case. *See Gateway Towers Condo. Ass'n v. Krohn,* 845 A.2d 855 (Pa.Super.2004). Consequently, our review may extend only to consideration of whether the evidence of record establishes a genuine issue of material fact surrounding the Cruzes' claim that they sustained harm as a result of Princeton's effort to

impose a guardian *ad litem*.[2] Gold, asserting that the evidence does not raise such a question, suggests that the Cruzes sustained only a "transient rub of life," an injury "[not] serious enough to warrant compensation, although there may be some pain attached." Brief for Appellees Gold, *et al.*, on Remand at 3 (quoting *Van Kirk v. O'Toole*, 857 A.2d 183, 185–86 (Pa.Super.2004) (quoting *Boggavarapu v. Ponist*, 518 Pa. 162, 542 A.2d 516, 518 (1988)). To support this conclusion, Gold cites testimony taken at the depositions of Jacqueline and Oscar Cruz in which the plaintiffs described their mental state upon learning of the guardianship petition as "upset" or "angry," without elaboration of accompanying physical manifestations.

¶ 7 Gold relies, in addition, upon our decisions enunciating the restrictive "impact rule" in intentional or negligent infliction of emotional distress cases, which limits actionable grounds to instances in where the plaintiff's emotional harm resulted from a physical impact to his or her person. Brief for Appellees Gold, *et al.* on Remand, at 4 (citing, *inter alia*, *Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232, 234 (1996); *Brown v. Philadelphia Coll. of Osteopathic Med.*, 760 A.2d 863, 868 (Pa.Super.2000); *Doe v. Philadelphia Cmty. Health Alternatives AIDS Task Force*, 745 A.2d 25, 28 (Pa.Super.2000); *Fewell v. Besner*, 444 Pa.Super. 559, 664 A.2d 577, 581–82 (1995); *Gregorio v. Ze-*

*luck*, 451 Pa.Super. 154, 678 A.2d 810, 814–15 (1996)). Inasmuch as the evidence here fails to establish any impact whatsoever, Gold asserts that we should find no question of material fact concerning the harm element of the Cruzes' claim and should, consequently, affirm the trial court's order granting summary judgment. Brief for Appellees Gold, *et al.* on Remand, at 5. Nevertheless, Gold cites no case law that applies the restrictive "impact rule" to claims of abuse of process, nor have we in our research discerned any.

¶ 8 The Cruzes, asserting that questions of material fact remain for consideration by the factfinder, rely on this Court's decision in *Shiner v. Moriarty*, 706 A.2d 1228, 1236 (Pa.Super.1998). In *Shiner*, the Court considered whether the evidence of harm adduced by the plaintiffs was sufficient to sustain judgments entered on claims of abuse of process where the plaintiffs failed to produce medical testimony to document the emotional harm they claimed.[3] *See Shiner*, 706 A.2d at 1239. Finding the evidence legally sufficient, we distinguished emotional harm as an element of damages to be assessed in actions for abuse of process from claims like intentional infliction of emotional distress where the emotional harm itself constitutes the cause of action.[4] *See id.* (allowing that the "unique elements" underlying claims for emotional distress have propagated a "pro-

---

2. Appellees Alan S. Gold and Gold, Butkevitz & Robins, P.C., are the only defendants to submit briefs on remand and are thus, presumably the only defendants against which the plaintiffs' claims remain pending.

3. Although the Opinion in *Shiner* does not describe the evidence adduced in substantial detail, our ruling suggests that the plaintiffs relied on their own recollections of emotional distress.

4. The tort of intentional infliction of emotional distress is defined by the Restatement Sec-

ond of Torts on the basis of subjectivity *in both cause and effect*. Restatement Second section 46 establishes the underlying right as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A.2d 988, 991 (1987) (quoting RESTATEMENT (SECOND) TORTS, § 46).

blematic and nebulously defined legal right").

■ ¶ 9 This rationale offers a critical distinction in this case as well. Unlike claims of abuse of process that rely for their impetus upon the filing of a docketed action, petition or other legal modality, causes of action for emotional distress depend on amorphous social constructs, *i.e.*, "extreme and outrageous conduct," to describe causation for equally amorphous injuries, *i.e.*, "emotional distress." Accordingly, restriction of the evidence available to prove a plaintiff's case, requiring medical documentation of the distress alleged through observation of symptoms, offers one of few elements of solid objectivity in an otherwise shifting evidentiary landscape. *See Shiner*, 706 A.2d at 1239 (quoting *Kazatsky*, 527 A.2d at 993–94) ("Expert medical testimony is required to establish a claim for intentional infliction of emotional distress. This requirement was imposed in light of the unique elements of that tort, which involves such a problematic and nebulously defined legal right as "to defy principled adjudication."). Consequently, we recognized in *Shiner* that while medical testimony is necessary to establish emotional harm in cases of intentional infliction of emotional distress, it is not necessary in cases of abuse of process. *See Shiner*, 706 A.2d at 1239 ("This rule [requiring expert medical testimony of emotional distress] is applicable only to that particular tort [i.e., intentional infliction of emotional distress] and does not apply to the instant abuse of process ...

claim[ ], which do[es] not involve the same elements.").

■ ¶ 10 *Shiner* informs our decision here. Moreover, our Supreme Court's remand order, which directs that we consider the harm element of the Cruzes claim in light of discussion in *McNeil*, 894 A.2d at 1275, reinforces our conclusion that neither impact nor medical documentation of distress related symptoms is necessary to the disposition of this abuse of process claim.[5] In the absence of a need to prove physical impact or to introduce medical testimony to establish emotional harm, the plaintiffs here are at liberty to prove their claims of abuse of process by way of any admissible evidence. Such evidence will be sufficient to raise a question of material fact and thereby survive summary judgment if either direct testimony or circumstantial evidence indicates that the Cruzes suffered emotional harm as a result of Princeton's filing of the guardianship petition.[6] *See Ludmer v. Nernberg*, 433 Pa.Super. 316, 640 A.2d 939, 943–44 (1994) (specifically relying on circumstantial evidence to establish element of attorney's "improper motive" in abuse of process case); *cf. Fitzpatrick v. Natter*, 599 Pa. 465, 961 A.2d 1229, 1242–43 (2008) (reaffirming that circumstantial evidence is entitled to as much weight as direct evidence, and is admissible to prove all elements of a negligence claim).

¶ 11 In this case, the Cruzes cite to their deposition testimony as evidence that they were emotionally harmed. Although

---

5. In *McNeil*, our Supreme Court addressed the statutory claim of Wrongful Use of Civil Proceedings, 42 Pa.C.S. § 8351, popularly known as the Dragonetti Act. While substantially similar to the common law cause of action of abuse of process, a wrongful use action incorporates a different causation element, *i.e.*, the defendant did not have probable cause for his action. Because the causes

of action are materially identical in all other respects, however, we interpret the Supreme Court's direction as an indication that the harm element shall be subject to the same measure of proof in both causes of action.

6. The Cruzes have dropped their claim of pecuniary loss occasioned by Princeton's filing of the petition.

devoid of the hyperbole on which the defendant's would insist, both plaintiffs' testimony indicates the upset and anger they experienced as the parents of a handicapped child confronted by a truculent adversary in unending litigation. At his deposition, Oscar Cruz testified as follows:

Q: Mr. Cruz, can you tell us what effect, if any, the petition to appoint a guardian had on the decision you and Jacqueline made to settle the case?

A: Well, when that petition, it's like Princeton would try, you know, do anything to give us pretty much nothing. So, from my understanding they put that petition together to have someone else decide how much should we get or not. So, it got me really upset.

* * *

Q: Mr. Silverman asked you if you had any counseling from being upset about the [filing] of the petition?

A: Yes.

Q: Were you upset about the petition being filed?

A: Yes. But I didn't get any counseling for it. I was upset about it.

Q: Were you and Jacqueline both upset about it, to your knowledge?

A: Yes.

Q: What about it upset you?

A: That Princeton would try to go that far to, you know, so they could settle the case, I guess, for less or more, it doesn't matter. But to have someone else decide instead of us.

(Deposition of Oscar Cruz (Exhibit J) to Response of Plaintiffs to Motion of Defendants Alan S. Gold, Esquire and Gold, Butkovitz & Robins, P.C. for Summary Judgment), 4/26/04, at 133–35. *See also*

*id.* at 111–112 ("[Oscar Cruz:] This petition, it was public record. And my brother is incarcerated. He read that. I mean, I felt embarrassed. It's embarrassing for me to have people that we don't even know stating that we're not good parents for Adam to decide what he should settle for.").

¶ 12 In addition, Mr. Cruz offered further detail about his exchange with Jacqueline Nieves Cruz, reflecting the couple's shared insult:

Q. Tell me what your wife told you about this petition.

A. The exact words or?

Q. If you don't remember any of the exact words then I want you to tell me what you can remember generally about the conversation. What did she tell you was filed?

A. I will tell you her exact words because I still remember them exact words, them crazy people from the insurance company want to tell us that we can't take care of our kids.

*Id.* at 70.

¶ 13 Further, Jacqueline Nieves Cruz reaffirmed those feelings in responses at her own deposition:

Q: Did you—when you did learn the petition had been filed, did you discuss this with Oscar?

A: Yes, I did.

Q: And what was the substance of that discussion with Oscar? What did you discuss?

A: I was upset.

* * *

Q: And what did you tell him?

A: From my understanding, that I was—we were unfit parents.

Q: Okay. And when you say unfit parents, what do you mean by that?

A: I felt like—how can I say this? We wasn't worthy enough to make decisions for Adam, for his well-being. That's the way I felt.

\* \* \*

They were trying to put someone else as Adam's guardian, because like I said, we were not worthy to make any decisions for Adam.

(Deposition of Jacqueline Nieves Cruz (Exhibit K to Response of Plaintiffs to Motion of Defendants Alan S. Gold, Esquire and Gold, Butkovitz & Robins, P.C. for Summary Judgment), 5/15/04, at 91–93).

¶ 14 Moreover, Ms. Cruz's recollection of her distress is reinforced by her understanding of the guardianship petition which, although legally incorrect, reflected her state of mind nevertheless. Ms. Cruz was adamant in her assertion that she understood the objective of the petition to be the *termination of her parental rights.*

Q. What was your understanding [of the purpose of the guardianship petition] back then?

A. When they filed this?

Q. Yes.

A. The only understanding I had was that I wasn't, you know—they were trying to take Oscar and I or eliminate us from making any major decisions for Adam.

Q. So it was any major decisions for Adam?

A. Any decisions for Adam.

Q. So it was your understanding that they were trying to terminate your ability—

A. My parental rights.

Q. It's your understanding they were trying to terminate your parental rights?

A. Correct.

Q. And the guardian would be able to make all the decisions that one would typically—for Adam, that one would typically expect a parent to make?

A. Correct.

Q. Where he went to school, type of medical care he had, all that type of information?

A Correct.

*Id.* at 94–95. *See also id.* at 153 ("I still say my parental rights were trying to be taken away."). Not surprisingly, given Ms. Cruz's understanding of the proceeding, she related having "anxiety attacks" before accepting the settlement offer. *See id.* at 145 ("We were both tired of the back and forth. I was, you know, getting anxiety attacks and was, you know—this was very overwhelming for me.").

¶ 15 Based solely on the foregoing direct evidence, we are compelled to recognize a question of material fact concerning the extent to which the Cruzes suffered harm as a result of the filing of the guardianship petition. Both parties offered matter-of-fact recollections of anger, upset, embarrassment, and insult that, while not medically documented, are nevertheless direct and consistent. Even were we to conclude to the contrary, however, the circumstances attending the filing of the petition and its aftermath are themselves substantial evidence from which a jury, in its exercise of human experience, could discern significant emotional distress. *Peugeot Motors of America, Inc. v. Stout,* 310 Pa.Super. 412, 456 A.2d 1002, 1005 (1983) (affirming that a party may establish its entire case on circumstantial evidence). As we have noted, the defendants argue stridently that the filing of the guardianship petition could impose no significant emotional harm. Nevertheless, their suggestion that the Cruzes' experience re-

garding the guardianship petition was, or should have been, no more than a "transient rub of life," ... "[not] serious enough to warrant compensation," Brief for Appellees Gold, et al., on Remand at 3, removes the matter from context, and as a consequence, falls wide of the mark. We find no guidance in the defendants' implicit comparisons of the Cruzes' experiences to a dog bite, id. (citing Van Kirk, 857 A.2d at 185–86), an unpleasant body odor, id. at 4 (citing Gregorio, 678 A.2d at 814–15), or "the minor psychic shock incurred in the course of daily living," (id. quoting Armstrong v. Paoli Mem. Hosp., 430 Pa.Super. 36, 633 A.2d 605, 608 (1993)). Consequently, we reject the defendants' assertions on this point as untenable and wholly at odds with human experience. The bond expected between a parent and child, to which we pay deserving attention in cases of custody, adoption, and termination of parental rights, is no less at issue in this litigation. The circumstances establish, as the Cruzes perceived (despite their misunderstanding of the law), that their exercise of the usual duties and prerogatives of parenthood was subject to interference by the awesome power of state. Given those circumstances, human experience offers every reason to suspect the very distress the Cruzes claim. We conclude accordingly, that the record, viewed in a light most favorable to the Cruzes, gives rise to a question of material fact concerning the harm element of the Cruzes' abuse of process action, which only the factfinder can resolve. Consequently, we are constrained to remand this matter for disposition at trial.

¶ 16 Order granting summary judgment **REVERSED.** Case **REMANDED** for further consideration consistent with this Opinion.

¶ 17 ORIE MELVIN, J. files a dissenting opinion in which FORD ELLIOTT, P.J. and LALLY–GREEN, J. join.

DISSENTING OPINION BY ORIE MELVIN, J.:

¶ 1 I respectfully dissent from the majority's decision to reverse the order granting summary judgment in favor of Appellees. I disagree that a genuine issue of material fact exists regarding whether the third element of the abuse of process claim was met here. Rather, I believe that Appellants have failed to show they sustained a compensable degree of emotional harm as a result of the filing of the guardianship action.[1]

¶ 2 "To establish a claim for abuse of process it must be shown that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff." Werner v. Plater-Zyberk, 799 A.2d 776, 785 (Pa.Super.2002). Abuse of process cases frequently turn on the second element of this three-part conjunctive test, and, hence, the courts of this Commonwealth have had little opportunity to discuss the third element of harm caused to the plaintiff.

¶ 3 In Shiner v. Moriarty, 706 A.2d 1228 (Pa.Super.1998), although it reversed the verdict on the plaintiffs' abuse of process claim on the grounds that such was preempted by the Bankruptcy Code, this Court arguably suggested that emotional harm is compensable in an abuse of process action by affirming the award of

---

1. I recognize that this issue was not reached by the trial court below, but this Court may affirm on any basis supported by the record.

Brickman Group, Ltd. v. CGU Ins. Co., 865 A.2d 918, 928 (Pa.Super.2004).

damages for emotional distress without differentiating between the three different theories presented (i.e., intentional inflection of emotion distress, abuse of process and intentional interference with contractual relations). *See id.* at 1239 (noting that expert medical testimony is not required to establish a claim for abuse of process). This Court did not describe the "emotional distress" alleged by the plaintiffs in *Shiner.* It does appear, however, that courts in other states generally recognize emotional harm as a compensable injury in abuse of process actions. *See generally* 20 CAUSES OF ACTION 223, Susan A. Lentz, Cause of Action for Abuse of Process §§ 9, 14 (2006); *see also Seltzer v. Morton,* 336 Mont. 225, 154 P.3d 561, 592 (2007) (upholding damages award in abuse of process and malicious prosecution action where plaintiff testified he lived in a "state of panic" accompanied by physical complications of anxiety, including irregular bowel function, perpetual upset stomach and sleeplessness as a result of defendant's conduct); *Sanders v. Pete & Sons Garage, Inc.,* 769 S.W.2d 844 (Mo.Ct.App. 1989) (affirming grant of new trial to defendants on counterclaim of abuse of process where defendant testified that plaintiff's suit required her to appear in court and made her nervous, causing upset stomach and sleeplessness).

¶ 4 In the present case, Appellants asserted in their complaint that they suffered "extreme emotional distress, fear, upset and anxiety that their parental rights would be terminated." I conclude, however, that in this case Appellants have failed to show a *compensable degree* of emotional harm and, therefore, cannot establish the third element of their *prima facie case.* Critically, at his deposition, Appellant Oscar Cruz testified as follows:

Q: Mr. Cruz, can you tell us what effect, if any, the petition to appoint a guardian had on the decision you and Jacqueline made to settle the case?

A: Well, when that petition, it's like Princeton would try, you know, do anything to give us pretty much nothing. So, from my understanding they put that petition together to have someone else decide how much should we get or not. So, it got me really upset.

\* \* \* \*

Q: Mr. Silverman asked you if you had any counseling from being upset about the [filing] of the petition?

A: Yes.

Q: Were you upset about the petition being filed?

A: Yes. But I didn't get any counseling for it. I was upset about it.

Q: Were you and Jacqueline both upset about it, to your knowledge?

A: Yes.

Q: What about it upset you?

A: That Princeton would try to go that far to, you know, so they could settle the case, I guess, for less or more, it doesn't matter. But to have someone else decide instead of us.

(Deposition of Oscar Cruz (Exhibit J to Response of Plaintiffs to Motion of Defendants Alan S. Gold, Esquire and Gold, Butkovitz & Robins, P.C. for Summary Judgment), 4/26/04, at 133–135). Appellant Jacqueline Nieves Cruz testified as follows:

Q: Did you—when you did learn the petition had been filed, did you discuss this with Oscar?

A: Yes, I did.

Q: And what was the substance of that discussion with Oscar? What did you discuss?

A:   I was upset.

\* \* \* \*

Q:   And what did you tell him?

A:   From my understanding, that I was—we were unfit parents.

Q:   Okay. And when you say unfit parents, what do you mean by that?

A:   I felt like—how can I say this? We wasn't worthy enough to make decisions for Adam, for his well-being. That's the way I felt.

\* \* \* \*

They were trying to put someone else as Adam's guardian, because like I said, we were not worthy to make any decisions for Adam.

(Deposition of Jacqueline Nieves Cruz (Exhibit K to Response of Plaintiffs to Motion of Defendants Alan S. Gold, Esquire and Gold, Butkovitz & Robins, P.C. for Summary Judgment), 5/15/04, at 91–93).[2]

¶ 5 The record reflects that the guardianship petition was filed on February 27, 2002. The trial court denied the petition on March 7, 2002 and shortly thereafter, Appellants agreed to a settlement in the underlying case. As to Jacqueline Nieves Cruz's claim that she believed her parental rights would be terminated, I would point out that the petition was limited in scope and never asserted any possibility that her parental rights would be terminated. At most, Appellants have established that they were "upset" by the filing of the petition to appoint a guardian for their child. While I do not mean to suggest that they had no basis to be upset by that event, I conclude that mere upset as described above is insufficient as a matter of law to satisfy the harm requirement of the claim for abuse of process. Accordingly, I respectfully dissent.

---

**2.** While there is additional deposition testimony in the record from Jacqueline Nieves Cruz regarding anxiety and depression, she clarified that she was not attributing this to the actions of the defendants. *See* Deposition of Jacqueline Nieves Cruz (Exhibit G to Motion for Summary Judgment of Defendant Princeton Insurance Company), 5/15/04, at 168–172; *see also id.* at 202–204.